# CHARLESTON.

HULINGS v. HULINGS LUMBER Co. *et al.*

Submitted June 13, 1893—Decided November 29, 1893.

1. CORPORATIONS—DIRECTORS.

   A corporation receives its certificate of incorporation and organizes under the act of February 28, 1877, called the "Boom Law." See Code (Ed. 1891) p. 1004. The board of directors must be composed of those who are stockholders, but they are not required to be residents of this state.

2. CORPORATIONS—DIRECTORS—FRAUDULENT CONVEYANCE.

   A corporation is unable to pay its debts or further carry on the business for which it was incorporated. Two of the board of directors compose a firm, which is a creditor at large of the corporation for a relatively large amount. The board of directors ordered the conveyance of all its property, real and personal, to be made to a trustee to secure and pay its debts, giving a preference to the claim of the firm composed of the two directors. These two directors, in violation of the statute (section 52, c. 53, Code) were present at the board while the subject of ordering the conveyance giving their claims such preference was being considered, but they did not vote on that question. *Held*, the conveyance giving such preference made by virtue and in pursuance of such order is *prima facie* fraudulent and void as to the preference thus given, when assailed by the creditors, and will be so declared, unless it be shown on behalf of such preferred creditor by the most clear and convincing proof that such preference was not only free from fraud, but was in itself in the circumstances both fair and reasonable.

3. VENDOR'S LIEN—SUBROGATION.

   Those who sold and conveyed land to the corporation reserved on the face of the conveyance a lien on the land for the payment of the balance of the purchase-money. A third person at the instance of the corporation advanced the money to pay off and lift such purchase-money notes with the understanding that he was to hold them as additional security for the money thus loaned and advanced. *Held*, such third person so paying and lifting from the vendors the purchase-money notes is entitled, as far as may be necessary, to be subrogated to such vendors' liens.

4. ASSIGNMENT—CHECK.

   A check operates as an equitable assignment *pro tanto* from the

time it is drawn and delivered, as between the drawer and the payee or holder.

5. ASSIGNMENT—CHECK.

A general assignment for the benefit of creditors does not defeat the check-holder, although the check be not presented to the bank for payment till after such assignment.

6. FRAUDULENT CONVEYANCE.

A case in which it is *held* that creditors assailing a deed of trust as illegal and fraudulent, and succeeding as to one, and only one, of the claims thereby secured, are not entitled to occupy, in the order of payment out of the trust fund, which is treated as a whole, the place thus made vacant, or to displace or in any manner lessen or impair the claims of the *bona fide* creditors, who are without fault and therefore retain the place given them in the trust-deed.

DAYTON & DAYTON, C. F. TETER, J. P. SCOTT and A. J. VALENTINE for appellants:

I.— *Charter.*—Acts 1885, 467–8 ; Code 1891, 1004.

II.—*Officers of Corporation, Trustees, &c.*—Wait In. Corp. § 162 ; 2 Morawetz Pri. Corp. § 803 ; 25 W. Va. 789 ; 37 N. Y. 317 ; 6 Wal. 752 ; 7 Wal. 299 ; 16 W. Va. 32 ; 75 Ind. 156 ; 20 Vt. 551 ; 30 W. Va. 443 ; 28 W. Va. 663 ; 2 Morawetz Corp. § 787–8 ; 44 Fed. Rep. 231 ; 45 Fed. Rep. 7 ; 39 Mo. App. 131 ; 33 Ill. App. 310 ; 33 Ill. App. 442 ; 29 Pac. Rep. 1063 ; 81 Tex. 452 ; Wait Fraud. Con. § 41 ; 5 Am. R. & C. 509 ; 2 Pom. Eq. Jur. §§ 958, 959, 1050 and 1077, and notes ; 1 White & T. Lead. Cas. in Eq. (2 Am. Ed.) 148, and notes ; 30 Barb. 553 ; 84 N. Y. 190, 198 ; 80 N. Y. 535 ; 56 N. Y. 48 or 485 ; 54 N. Y. 314 ; 59 Me. 277 ; 91 U. S. 587–8 ; 17 Wal. 610 ; 102 U. S. 148 ; 114 U. S. 587 ; 133 U. S. 30.

III.—*Director's disability—Non-residence.*—1 Morawetz Corp. § 361 ; 5 Col. 282 ; 45 Wis. 579 ; 2 Morawetz Corp. § 963 ; 13 Pet. 588–9 ; 2 Scam. 427 ; 23 Ill. 579 ; 11 Hump. 24 ; 20 Ind. 492 ; 25 Mich. 222 ; 51 Mich 145 ; 13 R. I. 312 ; 12 N. Y. 505 ; Code 1891, c. 53, s. 49.

IV.—*Creditors assailing trusts as fraudulent obtain priority.*—Code 1891, c. 133, s. 2 ; 27 Gratt. 487 ; 19 W. Va. 393 ; 30 W. Va. 443.

V.—*Ultra vires—Act of officer—Knowledge of immaterial.*—81 Tex. 306.

C. J. Heydrick and C. Heydrick for appellees Mitchell & Co., cited: 6 Cranch 8; 33 Pa. 151; 5 Bing. (N. C.) 455; 2 Vt. 283; 2 N. H. 193; 10 Pick. 129; 2 Rich. Eq. 64; 27 Ala. 445; 18 Am. & Eng. Ency. L. 251; 27 W. Va. 510; 12 How. 793; 96 U. S. 641; 60 Pa. 290; 20 W. Va. 807; 30 W. Va. 443.

J. Sprigg for appellee First National Bank of Cumberland, cited: Acts 1885, p. 407; Jones Corp. B. & M. §§ 117, 176; Code, c. 53, s. 49; 2 Doug. 124; 21 Pa. St. 146; 2 Cr. 449; 12 Wheat. 64; 1 Pet. 46; 19 N. H. 290; 5 Am. & Eng. Ency. L. 94–105; Jones Corp. B. M. §§ 45, 47; 12 Am. St. Rep. 412 (119 Ind. 324); 9 Johns. 159; 6 Cow. 23; 20 Am. & Eng. Corp. Cas. 519; 36 N. J. Eq. 548; 3 N. J. Eq. 349; 32 N. J. Eq. 236; Jones Corp. B. & M. §§ 205–209; 105 Mo. 255; 127 N. Y. 252; 122 N. Y. 135; 22 N. Y. 494; 63 N. Y. 62; 12 Wall. 358; 83 Ala. 115; 1 Law. R. & Rem. § 365; 1 Mor. § 502; 2 Mor. § 593.

A. B. Parsons and W. J. Hulings for Hulings & Co., cited: 12 N. Y. 872; 25 Ill. App. 168; Wood R'y L. 16–19, 356, 357; Cook St. Sthldrs. 689; Lutw. 508; 3 Gratt. 215; 19 Wend. 135; 27 Vt. 755; 1 Metc. 359; 12 N. H. 205; 2 Cr. 449; 11 S. & R. 411; 20 N. H. 58; 1 Laws R. & Rem. 637, 713, 801; 109 U. S. 522; 5 W. & S. 147; 1 C. F. Green 232; Catlin v. Eagle Steel Bk. 6 Conn.; 3 Gratt. 236; 30 W. Va. 123; 25 W. Va. 285, 293, 300, 789; 28 W. Va. 653; 78 Va. 736; 51 N. W. 512; 514 Am. Dig. § 256; 34 N. W. 467; 16 Ia. 284: 20 Vt. 425; 1 Watts 385; 60 Pa. 290; 1 Spears Eq. 445; 47 Conn. 47; 6 Id. 233; 13 Metc. 497; Field Corp. § 177; Ang. & A. Corp. § 233; 4 Wheaton 578.

Holt, Judge:

This is a suit in equity brought in the Circuit Court of Tucker county in February, 1891, by the appellee M. Howard Hulings, trustee, against the Hulings Lumber Company and the various creditors of that corporation, in order to receive the instructions and directions of the court and conform his action thereto in his administration of the trusts imposed upon him by the deed from the Hulings Lumber

Company to him, dated December 1, 1890. Defendants Kenneweg & Co. and fourteen other creditors of the Hulings Lumber Company, who are appellants, answered, and by way of prayers *etc.*, under the statute for affirmative relief attacked the deed of trust as illegal, fraudulent and void, and prayed that it might be set aside. Plaintiff replied specially to these various answers, and the issues were made up. On the 10th day of March, 1891, the cause was referred to Commissioner Adams, who was directed to ascertain and report the property, real and personal, of the Hulings Lumber Company, the state and condition of the title thereto, the liens thereon, to whom owing, with their respective amounts, order and priorities—all the facts touching the authorization and execution by the defendant corporation of the three deeds of trust in the bill and proceedings mentioned. In execution of this order, the commissioner took a great deal of testimony touching these matters, and on the 9th of June, 1891, returned a very full report, to which various exceptions were taken and filed. The commissioner filed a supplemental report.

On June 20, 1891, the court without passing upon the report or exceptions thereto, and by consent of all parties, decreed the sale of all the property, real and personal, in this state belonging to the Hulings Lumber Company, and appointed commissioners to make the same. A sale was made at the price of ninety five thousand six hundred and five dollars, and reported, but the court by decree of August 28, 1891, refused to confirm the same for inadequacy of price, set it aside and directed a resale, and by the same decree ordered the First National Bank of Cumberland to pay Kenneweg & Co. nine hundred and forty seven dollars and twenty five cents, amount of a check in controversy.

On the 2d of December, 1891, the cause came on for hearing on the merits, on the commissioner's report, exceptions thereto, and other papers, and the court on mature consideration overruled all the exceptions except that of Ann M. Garrison, which was sustained, placing her claim in the seventh class. In all other respects the report of Commissioner Adams was approved and confirmed subject to

certain modifications set out in the decree. By this decree the court held valid the three deeds of trust on the property in question and directed the payment of the various liens in the order thus provided for and as· reported by the commissioner.

·From this decree these fifteen defendants, on January · 30, 1892, obtained this ·appeal, assigning the following grounds of error: (1) It was error to overrule the various exceptions to the commissioner's report. (2) It was error to uphold, under the circumstances, the debt of thirty five thousand dollars of defendants F. W. Mitchell & Co. (3) It was error to refuse to hold all three deeds of trust nullities, and to refuse to decree defendants' several debts as just liens on the property of the corporation, in the order of the filing of their several answers praying such affirmative relief. (4) It was error, in any event, to sustain the debt secured in the last trust deed to defendants Hulings & Co., and to refuse to postpone it to petitioner's debts.

The important facts of the case are as follows: On the 20th day of February, 1884, Marcus Hulings, Willis J. Hulings, Noah F. Clark, John E. Butler, George W. Dorr, of Oil City, Pa., and William B. Maxwell, of St. George, W. Va., received from the secretary of state of West Virginia their certificate of incorporation, creating and declaring them from that date a corporation by the name of the Hulings Lumber Company until the 1st day of February, 1915. See Sess. Acts. 1885, p. 467. This certificate is the charter of the company.

Quite a controversy has been raised and discussed as to what chapter of our Code or act of the legislature this company was organized under. This is due, in part at least, to some acts which were not incorporated into the revisals subsequent to the revisal of the West Virginia Code of 1868, especially Act Feb. 28, 1877 (see Acts 1877, p. 178); as amended by Act March 10, 1881 (see Acts 1881, p. 296); as again amended by Act Feb. 9, 1882 (see Acts 1882, p. 15); again amended by Act Feb. 20, 1883 (see Acts 1883, p. 34); again amended by Act Feb. 27, 1885 (see Acts 1885, p. 47); again by Act Feb. 20, 1889 (see Acts 1889, p. 39). This act, authorizing the

erection of booms, *etc.*, was originally confined to a few counties in the state, and the amendments were chiefly confined to making it apply from time to time, to additional counties. The act of March 10, 1881, introduced for the first time the county of Tucker as one of the counties to which the act of February 28, 1877, applied. This was the only amendment of section 1, but in addition, sections 21, 23, 24, and 26 were amended and re-enacted; so that the act as thus amended, reads as we now find it in the Code of 1891 (Append. p. 1004) except the addition of other counties, by amendments of section 1 afterwards made.

This company was organized for the purpose of buying, selling, and manufacturing timber, *etc.*, for operating lumber mills, constructing a boom in Tucker county on Cheat river within two miles, and below the mouth of Shafer's Fork, *etc.* When we look at the act of 1877, as amended by the act of 1881, authorizing the construction of a boom in Tucker county, and by the twenty first section conferring the power, among other things, to purchase, sell, and hold timber lands, there can be no question but that this lumber company, owning a boom, sawmills, and about twenty five thousand acres of timber lands on Cheat river and its waters, was organized under this act, for by no other statute do we find all these powers conferred.

Under this act, therefore, it received its charter or certificate of incorporation. It organized at Oil City, Pa., on the 20th of February, 1885; Marcus Hulings having subscribed for one hundred shares, of one hundred dollars each; Willis J. Hulings, one thousand two hundred and seventy five shares; Noah F. Clark, ten shares; George W. Dorr, ten shares; and William B. Maxwell, five shares—making one thousand five hundred shares, of one hundred dollars each, one hundred and fifty thousand dollars the amount of the capital stock, of which twenty five thousand dollars were paid in *pro rata* by the stockholders. The board of directors then and there elected were Noah Clark, J. E. Butler, J. C. Simpson, Samuel Justice, Marcus Hulings, George W. Dorr, and W. J. Hulings. W. J. Hulings was elected president, J. E. Butler treasurer, and D. W. Osburn secretary. Its principal office or place of business has

always been Oil City, state of Pennsylvania, with a branch office at St. George, Tucker county, W. Va., the county where much of its property is situated.

On the 6th day of February, 1886, the lumber company, being in need of some thirty or forty thousand dollars to pay off and lift from the several vendors the balance of the purchase-moneys respectively due them on the several tracts of land which they had sold and conveyed, reserving on the face of the conveyances liens for such unpaid balances, induced defendants F. W. Mitchell & Co., bankers of Oil City, to lend the money, thirty five thousand dollars, by giving them a deed of trust to secure the same on the various tracts of land, comprising about twenty four thousand eight hundred acres. It was also a part of the agreement that F. W. Mitchell & Co. were to hold as further security for the money loaned, the purchase-money notes with their vendor's liens thus paid to the original vendors and taken up. This agreement was carried out.

The deed of trust of February 6, 1886, on all these lands, (twenty nine tracts) was duly executed by the company, conveying the same to C. M. Husbands, Jr., trustee, and was duly acknowledged and admitted to record in the counties of Tucker and Randolph, where the lands lie, and the purchase-money notes were lifted and turned over to F. W. Mitchell & Co., who still holds them unpaid as further security under the agreement.

On the 1st day of July, 1889, the lumber company, being still further in need of money to carry on its operations and pay its debts, conveyed all its real property situate in Tucker county, describing it to William H. Wise, trustee, to secure the payment of seventy five bonds, of one thousand dollars each, which deed was also duly executed, acknowledged, and admitted to record in the county of Tucker. These bonds were never sold, but were hypothecated to various banks and individuals as security for money loaned the lumber company, aggregating the sum of about forty nine thousand five hundred dollars. Both of these trust deeds are recited as subsisting liens in the trust deed of general assignment to pay debts executed to M. Howard Hulings, trustee, the plaintiff in this suit.

It is claimed on behalf of appellants that all three of these deeds of trust are nullities, and therefore confer no liens and give no preferences, because the directors, one and all, are now, and have been from the beginning, non-residents of this state, and that it is subject to section 49, c. 53, of the Code, which on this point reads as follows:

"They (the stockholders) may in general meeting by a by-law prescribe the number of which the boards (of directors) shall consist; but unless a different number be so prescribed there shall be five directors. They may also by by-law prescribe the qualification of directors; but if it be not otherwise provided every director must be a resident of this state and a stockholder."

In my opinion, this point is not well taken, for the following reasons:

(1) This company obtained its certificate or charter of incorporation under section 3, c. 121, of the Acts of 1877, giving—first the name of the proposed corporation; second, the place at which it was proposed to construct its boom, dams, etc., within two miles below the mouth of Shafer's Fork of Cheat river, Tucker county; third, the place at which shall be established and maintained the principal office, viz. Oil City, state of Pennsylvania; fourth, the time of commencement, etc.; fifth, the amount of capital stock, viz. one hundred and fifty thousand dollars, the number of shares, one thousand five hundred, each of the par value of one hundred dollars; sixth, the names and places of residence of the several persons forming the association for incorporation, and the number of shares subscribed by each, showing that five of the corporators subscribing for all the capital stock, except the nominal amount of five shares out of the one thousand five hundred, are non-residents of this state, and residents of Oil City, Pa.

(2) Section 6 of the Act of 1877 provides that every corporation organized under the provision of this act shall hold its first meeting at such time and place as may be designated by the corporators thereof, and all subsequent meetings at such place or places, in or out of this State, as the directors may from time to time appoint, except as hereinafter specially provided; and the stockholders shall

have authority at their first meeting or at any subsequent meeting to fix and determine the place of meeting (in or out of this State) of the directors, and the principal office or place of business of said corporation. Such corporation shall have and maintain an office or place of business in this State for the transaction of business, specifying what must be done and kept there with great detail and particularity; and so with section 7. The Act of 1877 comprehends the provisions of section 49 of chapter 53 of the Code, covering the same ground to their exclusion in the case of boom companies. Like section 48, c. 53, it prescribes that, if the by-laws fix no place for the annual meeting of the stockholders then it shall be held at the principal office or place of business of the corporation; in this case, at Oil City. It provides that the number of directors shall be not less than five, nor more than thirteen, and prescribes as their qualifications that they shall be stockholders, not that they must be residents of this State and stockholders, as in section 49; thus covering the ground completely, in default of by-law, both as to the place of meeting and the number and qualifications of directors. Chapter 181 of the Acts of 1872–73, to which it is made subject, relates to the right of the voting stockholder to cumulate his votes (see Acts 1872–78, p. 535) and section 29 of the act of 1877 does not alter the construction in this respect; for section 49, c. 53, on this point, as well as on many others, is plainly excluded by this act as covering fully the same grounds with inconsistent provisions. In fact, the main purpose of companies such as this is to buy and own timber lands, and manufacture and sell lumber; and this can not be done, so far as holding the necessary quantity of timber land is concerned, under any other act or chapter. See fifth clause of section 21 of the act of 1877. Any other construction than this would contravene its main purpose, and render idle and nugatory its charter.

Defendants Willis J. Hulings and John E. Butler, who were the partners composing the firm of Hulings & Co., conveyed to the corporation property estimated at about seventy thousand dollars, consisting of mills, boom, saw logs,

tools, horses, and camp equipage; and Marcus Hulings and wife conveyed to it about twenty one thousand acres of timber lands, situated in the counties of Randolph and Tucker. When Mr. Hulings obtained title to these lands he gave his notes for deferred payments, his vendors retaining in their respective deeds liens therefor; and at the time of his conveyance to the corporation there were outstanding, and not yet due, twenty eight thousand eight hundred and thirty seven dollars and seventy cents of these liens, with interest, and in his deed to the corporation he retained a vendor's lien for the same amount, agreeing however, that the discharge of any of these liens to his vendors should work a discharge *pro tanto* of the lien retained by him. Subsequently the Hulings Lumber Company acquired title to about four thousand acres of other lands, by consummating mere options to purchase, which M. Hulings held, and upon which vendor's liens were retained in the deeds of conveyance to the extent of about eight thousand seven hundred and fifty dollars. This includes interest to June 12, 1891.

Thus the Hulings Lumber Company, in the year 1885, became the owners of about twenty five thousand acres of land, charged with the payment of these sums, to the amount of twenty eight thousand eight hundred and thirty six dollars and seventy cents; for the payment of which the vendors selling to M. Hulings retained liens upon the face of their respective conveyances, which are of record; and the notes given therefor are not paid, but have been assigned or transferred, and remain unpaid in the hands of other parties, most of them in the hands of defendants F. W. Mitchell & Co.

Soon after the organization of the corporation, viz. on November 4, 1885, a directors' meeting was held at Oil City, which has always been the place of the principal office, until, on June 13, 1890, it was changed to Hulings, W. Va., with a branch at Oil City. At this meeting on November 4, 1885, J. E. Butler, J. C. Simpson, Samuel Justice, George Dorr, Marcus Hulings, and W. J. Hulings constituted the board of directors, and were the owners of ninety *per cent* of the stock. W. J. Hulings was president,

J. E. Butler was treasurer, and D. W. Osburn was secretary, and there was no change in the personnel of the board or the officers down to March 9, 1887, when, Dorr having resigned, at a meeting of the stockholders they were all selected, except that F. H. Steel was elected a director in the place of G. W. Dorr.

This act of 1877 vests all the corporate powers in the board of directors, and section 1, c. 52, which treats of corporations, generally declares what a corporation shall be, and enumerates its powers; and among them it may sue and be sued; plead and be impleaded; contract and be contracted with, by simple contract or specialty; purchase, hold, use, and grant estate, real and personal, appoint officers and agents, prescribe their powers, duties and liabilities; take bond and security from any of them, and fix and pay their compensation; and make ordinances, by-laws and regulations for the government of its council, board, officers, and agents, and the management and regulation of its property and business—such in fact as the common law itself makes it. See Report of Revisors of Code of 1849, p. 323.

The directors of a corporation are, as to all purposes of dealing with others, the corporation itself, and, when convened as a board, they are the primary possessors of all the powers possessed by the corporation. What they do as the representatives of the corporation the corporation itself is deemed to do. See *Ellerman* v. *Stock Yards Co.*, (N. J. Chy; filed Dec. 18, 1891) 23 Atl. 287, 35 Amer. & Eng. Corp. Cas. 388, and notes of editor. A director duly elected or appointed is a director *de jure.* Those who usurp the office of director, and exercise the functions of the board of directors, under color of the election or appointment in itself not legal, become directors *de jacto;* and the official acts of such board are valid in reference to rights which innocent third parties or strangers to the corporation may thereby acquire, for they are not bound to know— often have no right to know—what goes on in the privacy of the council chamber of the directors or stockholders.

The board of directors, at this meeting held at the principal office in Oil City, Pa., on the 4th day of November,

1885, entered an order in their record or minute book, by which they authorized the president, Willis J. Hulings, to negotiate a loan for the purpose, among other things, of paying off the balance of the indebtedness for its lands; and he reported to a meeting of the board held on the 14th of December, 1885, at the same place, that he had negotiated a loan for thirty five thousand dollars from defendants F. W. Mitchell & Co., a firm composed of F. W. Mitchell, F. H. Steel, and W. H. Wise.

At a directors' meeting held February 6, 1886, at the principal office, W. J. Hulings, the president, presented, and was authorized to execute, to C. M. Husbands, trustee, and did execute, the deed of trust of February 6, 1886, by which the Hulings Lumber Company, by its president, conveyed to the trustee various tracts of land in the counties of Tucker and Randolph, embracing about twenty four thousand eight hundred acres, in trust to secure to F. W. Mitchell & Co. the payment of the loan of thirty five thousand dollars and the vendors' notes, secured by vendors' liens, retained, were lifted and put in their hands, as assignees or transferees, to hold as additional security for their loan to the lumber company, which loan, with six *per cent.* interest, payable semiannually, was due November 1, 1887. This is deed of trust No. 1, already referred to.

But in the mean time—that is, from February, 1885, to February, 1886—many of these notes given for the purchase of these lands, had fallen due, and defendants, Hulings & Co. took up these notes to the amount of eight thousand two hundred and ninety nine dollars and two cents, with interest to June 12, 1891, composing a part of said sum. They also paid taxes and advanced other sums to the corporation, amounting in all, with interest to December 5, 1890, to thirty thousand three hundred and eighty three dollars and seven cents On December 7, 1886, the Spring Garden Bank of Pennsylvania brought suit in equity, by foreign attachment, in Tucker county, to make these lands liable for a debt claimed by the bank to be due it from Marcus Hulings, upon the ground that the corporation was not in existence when the conveyance was made to it by Marcus Hulings, and that it was voluntary

and fraudulent as to his creditors. Such proceedings were had 'in the court below that on September 7, 1887, a decree was entered holding the deed void, and referring the cause to a commissioner to ascertain and report the liens on the lands, *etc.*; and, upon the coming in of the commissioner's report, the court, on 14th May, 1888, made a decree fixing the amounts and priorities of the various liens on the land, and directed a sale thereof. From this decree the defendant here, the Hulings Lumber Company, appealed, and this Court reversed it, holding the conveyance good. See *Spring Garden Bank* v. *Hulings Lumber Co.*, 32 W. Va. 357, 360 (9 S. E. Rep. 243).

In February, 1889, it was determined to enlarge the business, and in anticipation thereof, it seems, the stockholders had each donated one third of his holdings of stock to the treasury of the company, thus putting into the treasury fifty thousand dollars of stock, which was to be sold at par; and, F. H. Steel and Willis J. Hulings having purchased twenty thousand dollars of this treasury stock at par, J C. Forgie & Co., on February 5, 1889, were induced to purchase the remaining thirty thousand dollars at par.

At a regular meeting of the directors held at Oil City on July 15, 1889, and at another meeting of the directors held at the same place on the 19th day of August, 1889, at which all the directors were present, and at which all the stock was present and represented, except forty one shares out of the one thousand five hundred shares, the president and secretary were authorized and directed to prepare seventy five thousand dollars of its first mortgage bonds, of one thousand dollars each, bearing six *per cent.* interest, and payable to bearer, with interest payable semiannually, evidenced by coupons of thirty dollars each, attached—from one to fifteen inclusive, due and payable July 1, 1890; sixteen to thirty, inclusive, due and payable July 1, 1892, *etc.*; and sixty one to seventy five, due and payable July 1, 1894. See *State* v. *Standard Oil Co.*, 49 Ohio St. 137, point 2 (30 N. E. Rep. 279). To secure the payment of these bonds, the Hulings Lumber Company, by its president, Willis J. Hulings, by deed dated 1st July, 1889, and duly recorded in the counties of Tucker and Randolph, granted

and conveyed to William H. Wise, trustee, all its property in the state of West Virginia, consisting of twenty four thousand eight hundred acres of land, situate in those two counties, together with a narrow-gauge railroad, five miles in length, the rolling stock and equipments, the sawmills and machinery, and all other improvements constructed and erected on the property. This is deed of trust No. 2, already mentioned.

These bonds were originally intended in part to pay off the Mitchell & Co. debt, but were afterwards, by resolution of the board of directors, directed to be hypothecated for other purposes. On August 11, 1890, the president of the Hulings Lumber Company borrowed of the First National Bank of Cumberland, Md., ten thousand dollars for four months, and placed ten of these bonds as collateral security with the bank; and on August 8th the president of the company borrowed the further sum of ten thousand dollars of this bank, and deposited fifteen thousand dollars of these bonds as collateral. Both sums borrowed were placed in the bank to the credit of the lumber company, and paid out on its checks. The president also borrowed of Simpson, Clapp & Co. seven thousand five hundred dollars, and deposited fifteen thousand dollars of these bonds as collateral; of George W. Delameter six thousand dollars, and deposited with him ten thousand dollars of them as collateral; of Drexel & Co. six thousand dollars, and deposited with them eleven thousand dollars as collateral; and deposited with Geo. F. Craig & Co. fifteen thousand dollars, the residue, but they were all equally secured and payable pro rata.

At Oil City, December 1, 1890, at a meeting of all the directors, who were also owners of all the stock, except forty three and one third shares, a resolution was offered and adopted which, after reciting that the Hulings Lumber Company was indebted in various sums, amounting in the aggregate to about the sum of one hundred and forty one thousand dollars, the greater portion of which had already matured, and the residue would mature in a few days, and that it was unable to provide the money to meet its debts, although the value of its real and personal property was be-

lieved to be greatly in excess of its entire indebtedness, authorized and directed the president of the company to execute an assignment or deed of trust of all its property, real and personal, to such person as he should deem suitable for that purpose, in trust for all the creditors of the company, with preference in favor—First, to Hulings & Co., for the amount of their just claim; second, to Kay Bros. for two thousand eight hundred dollars; and next, to use his discretion in making preference in regard to the other indebtedness of the company, but to be subject to the Husbands deed of trust, and to the Wise deed of trust. This is deed of trust No. 3, already mentioned.

Hulings and Butler, who composed the firm of Hulings & Co., were present, but did not vote. The preference to them was not suggested by either of the partners, but by other directors, who knew that Hulings & Co. had been lending the company large sums of money for four or five years, which was expended in betterments of the property, which advancements had been audited and approved by three several disinterested auditing committees, at a time when none of the present creditors at large had any existence. This resolution was carried into effect by the deed of the Hulings Lumber Company of December 4, 1890, by which, by its president, it granted and conveyed all its property, real and personal, to M. Howard Hulings, in trust for the various creditors, and in the order of preference therein named: (1) The debt of F. W. Mitchell & Co., of about thirty nine thousand dollars secured by the Husbands deed of trust, (No. 1 :) (2) for the holders of the seventy five one thousand dollar bonds under the Wise deed of trust. (No. 2;) (3) all just labor claims, *etc.*, (these have been paid, and are not involved); (4) Huling & Co., their debt of twenty two thousand nine hundred and seven dollars and eight cents, then amounting to thirty thousand three hundred and eighty three dollars and seven cents; (5) Kay Bros. & Co., two thousand eight hundred dollars; (6) *pro rata* all other indebtedness of the grantor incurred for merchandise, machinery and supplies; (7) *pro rata* all other indebtedness of the grantor not then paid. The trustee was to take possession at once, wind up as rapidly as possible, and pay the

debts secured. In sixty days afterwards, he brought this suit to administer his trust under the authority and direction of the Circuit Court of Tucker• county, as already mentioned.

As to the validity of the Mitchell & Co. loan of thirty five thousand dollars, secured by the Husbands deed of trust. It has already been shown that this company was incorporated under the act of 1877, as amended by the act of 1881, and that it was not governed by section 49 of chapter 53, of the Code; that its directors might all be nonresidents of the state; and that the proper place of meeting both of stockholders and directors was at their principal office or place of business at Oil City, as mentioned and set forth in the charter, unless otherwise prescribed by the by-laws, for in these respects the act of 1877, as amended, is inconsistent with section 49 of chapter 53 of the Code (see section 29 of the act of 1877;) and, besides, it was the place of meeting prescribed by the by-laws.

When this loan was negotiated, and the Husbands deed of trust was executed, F. H. Steel, a member of the firm of F. W. Mitchell & Co., was not one of the board of directors, and did not become one until, after that transaction, he was elected to fill the place of George W. Dorr, resigned. The validity of the Wise deed of trust is attacked on the same grounds, which need not be further discussed. These creditors who hold these seventy five one thousand dollar bonds can only recover the amount of their debts for which these bonds were hypothecated, forty nine thousand and five hundred dollars and interest, and they do not claim any more.

This question touching the validity of these two deeds of trust was directly submitted to the commissioner. All the books, *etc.*, of the company were to be submitted to him, and the officers to be examined by him. This was done, and Willis J. Hulings rendered before him on oath a full and, as far as I can see, a frank statement of all the details of the transaction of the board of directors and meetings of stockholders; and the commissioner reports them valid and subsisting liens, and this is confirmed by the Circuit Court. After a searching examination this rec-

ord discloses, so far as I can discover, no substantial ground for impugning the entire good faith of these two trust debts of the two deeds made to secure them, or to question their honesty or validity in any respect whatever.

The claim of F. W. Mitchell & Co. was the aggregate of certain valid and subsisting vendors' liens, retained on the face of the deeds of conveyance to Marcus Hulings before the corporation had any existence. F. W. Mitchell & Co. became the holders of these liens for full value, and at the instance and at the request of the corporation, before any member of this firm had become a director, and by no act of the board of directors since the election of F. H. Steel as a director has their security been improved, or any advantage in any way been gained by them. The bondholders under the Wise deed of trust advanced their money in good faith, upon the hypothecation of these bonds thereby secured, and are clearly entitled to have their money paid back with its interest out of the proceeds of the sale of the property, and they ask no more. And this is the law, whether the apparent and acting directors were directors *de jure* or only directors *de facto.*

Having already seen that this corporation was created under the act of 1877 and amendments thereof, and that it was not necessary for the directors to be residents of this state, and that they were directors *de jure,* as well as *de facto,* that question and the questions connected therewith discussed by counsel upon the hypothesis of their not being officers of the corporation *de jure* need not be further considered, except that I wholly fail to appreciate the force of the argument based on any state policy against nonresident directors. The real estate, sawmill and other property were in this state. The articles of incorporation were recorded in Tucker county, and in the office of the secretary of state; also a copy of their by laws. The corporation had an office and place of business in this state, in Tucker county, where its property was, and its business of manufacturing lumber was carried on, as required by section 6 of the act of 1877. It was not a corporation created by non residents, under the laws of this state for the purpose of manufacturing lumber in some other state; and I do

not see how it differs in any respect from any other corporation organized under the laws of this state for the purpose of carrying on business therein. In what state the stockholders may happen to reside is a matter wholly indifferent. Not only were their timber-lands, boom, saw-mills, etc., in this state, but in this state this corporation kept an office for the transaction of business, where an exhibit of all transfers of its stock is kept, in which are kept for the inspection of any officer or stockholder books, wherein are recorded the amount of capital stock subscribed and by whom, the names of the owners of its stock, the number of shares held by each person, and the number by which each of said shares is respectively designated, and the amount owned by them respectively, the amount of stock paid in and by whom, the transfer of said stock, the amount of the company's assets and liabilities, and the name and place of residence of all its officers. It also had a person appointed by power of attorney to accept service of any process or notice.

I see no trouble as to subrogating F. W. Mitchell & Co. to the vendors' liens. It is true that these liens were in the ordinary sense extinguished by payment made to the original vendor of the land out of money advanced by Mitchell & Co., but they were not destroyed but turned over to these bankers, for the purpose and with the understanding on the part of the debtor corporation, which had agreed to lift them, that they should be treated as still subsisting, and that, as far as it could be done without injury to the rights of others, Mitchell & Co. should be substituted to the rights and remedies of the lienors.

This doctrine of subrogation is said to be a creature of courts of equity suggested by or with qualification adopted from the civil law, so administered as to secure substantial justice without regard to form and often independently of of any contractual relation, and therefore is not allowed, where it would work injustice to the rights of others, or defeat or impair any higher supervening equity. See Sheld. subr. (2d Ed.) § 1 et seq. Mitchell & Co., having become or being about to become creditors by special lien on the same property had a right on that ground also to lift the ven-

dor's lien, and keep it alive as additional security for the money loaned.

This brings us to the main point of controversy; that is, the validity of the third deed of trust, executed December 5, 1890, conveying all the property of the corporation for the benefit of all the creditors to M. Howard Hulings, trustee, called the "Hulings deed of trust." The question as to the good faith and validity generally of this assignment to secure and pay creditors was also submitted to Commissioner Adams, with directions to take testimony, examine the books and papers of the lumber company, examine on oath the officers of the corporation and others, and report thereon, together with such other matters as he might deem pertinent or any party require. This the commissioner has done, returning with his report all the books and papers put in evidence before him, together with all the testimony taken touching the matters referred.

In this case the company was insolvent, and two of the directors, on December 1, 1890, when the resolution was passed authorizing and directing this deed of trust, and the preference given the debt of Hulings & Co. to be thus preferred, were the two partners, Willis J. Hulings and J. E. Butler, who composed the firm, and were present, and although they did not suggest such preference or vote on the adoption of the resolution, this conveyance was *prima facie* fraudulent and void as to these appellants, who were creditors of the grantor, the Hulings Lumber Company; and the burden is on Hulings & Co., the preferred creditors, to remove this presumption of fraud by clear and convincing proof that such conveyance was fair and reasonable and absolutely free from fraud. *Sweeny* v. *Refining Co.*, 30 W. Va. 443 (4 S. E. Rep. 431); *Hope* v. *Salt Co.*, 25 W. Va. 789. Still, it was held that an insolvent corporation, having ceased to do business, has the same power as an insolvent individual to prefer a creditor in a general assignment of all its property for the payment of its debts. *Burr* v. *McDonald*, 3 Gratt. 215; *Pyles* v. *Furniture Co.*, 30 W. Va. 123 (2 S. E. Rep. 909).

At the time this trust deed was made, there was nothing in the policy of our statutes which forbade an insolvent

corporation to prefer creditors, but the statute on the subject is now changed. See latter clause of section 2, c. 74, Code 1891 (Acts 1891, c. 123). So that the question is in this case : Have Hulings & Co. removed the *prima facie* presumption of fraud by clear and convincing proof that such conveyance was fair and reasonable, and absolutely free from fraud ?

Where questions purely of fact are referred to a commissioner in chancery, his finding will be given great weight, though not as conclusive as the verdict of a jury. *Reger* v. *O'Neal*, 33 W. Va. 159 (10 S. E. Rep. 375). In such case his findings will be given great weight and should be sustained, until it plainly appears that they are not warranted by any reasonable view of the evidence, and this view operates with peculiar force in the appellate court, when the findings of the commissioner have been approved by the decree of the court below. *Moore* v. *Ligon*, 30 W. Va. 147 (3 S. E. Rep. 572). Every presumption is in favor of the correctness of the decision of the master. *Medsker* v. *Bonebrake*, 108 U. S. 66 (2 Sup. Ct. 351); *Tilghman* v. *Proctor*, 125 U. S. 136 (8 Sup. Ct. 894); *Callaghan* v. *Myers*, 128 U. S. 617 (9 Sup. Ct. 177); *Kimberly* v. *Arms*, 129 U. S. 512 (9 Sup. Ct. 355). If the testimony is conflicting, the Court will rarely interfere with the master's decisions on the facts, provided he made no errors of law which affected the result. See *Welling* v. *La Bau*, 34 Fed. 40; *Mason* v. *Crosby*, 3 Woodb. & M. 258; *Gottfried* v. *Brewing Co.*, 22 Fed. 433; *Jaffrey* v. *Brown*, 29 Fed. 476; *Central Trust Co.* v. *Texas & St. L. Ry. Co.* 32 Fed. 448; 1 Fost. Fed. Pr. (2d Ed.) § 315; 2 Bart. Chy. Pr. 656; 2 Daniell Chy. Pr. 1317.

What are questions purely of fact within the meaning of the rule? However much Blackstone's definition of "municipal law" has been criticised, it remains with slight modifications (expressing, perhaps, what is already implied) the definition given by common-law courts to this day. See 1 Hammond's Bl. Comm. 95, notes of editor ; 1 Bish. Crim. Law, §§ 1, 2, note; Bouv. Law Dict.; Black. Law Dict. Municipal law is a rule of civil conduct, prescribed or recognized by the supreme power in a state, commanding

what in its opinion is right or convenient, and prohibiting what is wrong or inconvenient. The rule of civil conduct is based upon certain principles, which can neither be ignored nor left out. These principles controlled in their application by custom constitute the common-law. The rule as a definition, makes the principle applicable to a definite class by one or more common sense practical characteristics. The point of law is contained implicitly in the judgment of the court and springs out of the facts guided by the prayer for relief, as shown by the pleadings, to which a rule or principle of law is applied. Hence the point of law implied in the order or judgment prayed for, and given or refused, is always mixed with the facts of the case, in the sense of springing out of them as the result of the application of some principle or rule.

But that is not the true meaning of the term "a mixed question of law and fact." A fact, as distinguished from the law, may be taken as that out of which the point of law arises; that which is asserted to be or not to be, and is to be presumed or proved to be or not to be, for the purpose of applying or refusing to apply a rule of law. The true meaning can be better shown by an illustration. The question of negligence as a want of ordinary care is generally a mixed question of law and fact, one for the jury, under the instructions of the court. See 2 Thomp. Trials, §§ 1662, 1705; Cooley, Torts (2d Ed.) 800, 801, et seq. The prudent man, for the occasion, with reference to what he would do, and therefore what the defendant must have done under the circumstances, is formed in the minds of the jury by the light of the facts as they find them to be, under the instructions of the court as to what the law requires him to do in a given or supposed state of facts, which there is some evidence tending to prove, and so on through all the complications of the various questions of negligence. The questions of fraud are still more complicated, for they hardly ever occur alone, but, whatever the evidentiary facts may be, the question whether they make out a case of fraud or not is a question of law. So, whether the evidence tends to show fraud is a question of law. See 2 Thomp. Trials, § 1935. See, also, *Hooe* v.

*Marquess,* 4 Call. 416. There being such evidence, it is generally said to be a mixed question of law and fact, and therefore one for the jury or commissioner. Actual fraud, fraud involving guilt (*scienter* guilty knowledge) may be said to be anything false said or done (not by way of promise *de futuro*) to the injury of the property rights of another.

But the case here involved does not belong to that class, but to what is called "constructive fraud," depending upon a fiduciary or confidential relation between the parties. There was no actual falsehood or deceit, no concealment of facts which the party ought to have made known, but participation in an act which, if held good, would violate a confidence and trust, which the law implies and imposes in a given state of facts, pronouncing such violation of the trust as in some cases conclusively, in others *prima facie* fraudulent.

In this case we start out with the preference given the claim of Hulings & Co. as *prima facie* fraudulent. So for as the commissioner had the witnesses before him, and saw and heard them testify, he is the judge of their credibility, as far as it depends on manner and general demeanor. The commissioner reaches the conclusion that the preference given the claim of Hulings & Co. is valid, being without taint or suspicion of fraud or unfairness; and he gives the following statement of the evidentiary facts that bring him to this conclusion :

"(1) The evidence and records before me clearly show that this sum remained due and owing Hulings & Co. several years before the creation of the debts due the persons on whose claims their claim is preferred. (2) These advances were made to the company, which had valuable property, and but little money, to enable it to put things in motion, and give the property available value, with the promise, and no doubt expectation, of speedy repayment out of the timber manufactured into lumber and sold. (3) Eight thousand dollars of it was to lift for the company vendors' liens reserved on the faces of the conveyances from the several vendors on the lands sold and conveyed to Marcus Hulings, which the company was bound to pay as

a part of the consideration of the purchases and convey-ance of these same lands by Marcus Hulings to the com-pany; also taxes on these lands. This began in February 1885, and ran through the years 1886 and 1887. And (4) during these same years Hulings & Co. advanced to the lumber company over twenty two thousand dollars cash, to pay hands, buy logs and supplies, and pay running ex-penses, all shown in detail by itemized statements, duly proved, and with vouchers, consisting of checks drawn by Hulings & Co. on the Oil City Trust Company, to the order and for the account of the Hulings Lumber Company. This account was audited by two different auditing com-mittees, of disinterested persons, in the years 1886 and 1888. That the firm of Hulings & Co. is composed of Wil-lis J. Hulings and John E. Butler, who are directors of the Hulings Lumber Company; but they did not vote for the resolution giving them the preference, nor did the sugges-tion thereof come from them, or either of them, though present at the meeting, but was proposed by and voted by the three other directors of the the company, who had no interest of any kind in the claim; and that this claim amounts to thirty one thousand ninety three dollars and nineteen cents, with interest included, computed to 12th of June, 1891."

The members of the firm of Hulings & Co. were exam-ined by the commissioner, and no doubt he was impressed favorably by, among other things, their full and unre-served statements on all points touching the inquiry he had before him for investigation.

I can not agree with the commissioner in the conclusion he draws from these facts; for, although the two directors of the lumber company who compose the firm of Hulings & Co. did not suggest the preference given their claim, nor vote for it, yet, in violation of the statute (see section 52, c. 53, Code) they were "present at the board while the same was being considered, thus bringing them within the rule laid down in *Sweeney* v. *Refining Co.*, 30 W. Va. 443 (4 S. E. Rep. 431) and *Hope* v. *Salt Co.*, 25 W. Va. 789.

The directors of this corporation, of which the members of the firm of Hulings & Co. were two, occupy the relation

of trustees to this corporation and its property. It was insolvent, without one cent to pay its creditors, save what was conveyed by this deed of trust No. 3. Neither the corporation itself nor its stockholders had any longer any beneficial interest in the property, except upon remote and unlikely contingencies; and therefore they are not affected by the fraud in law, if any, of the corporation brought about by its board of directors. In such case the creditors alone can be affected; in this case the creditors at large— those without specific liens. The capital stock was issued and transferred in payment on these twenty four thousand eight hundred acres of timber-land, and the boom, mills and lumber-plant thereon sold and conveyed to the corporation, and was worth no doubt all that the vendors received for it in stock, at par, viz. about one hundred and twenty thousand dollars; so that this "real estate," as we may call it, including therein all the appliances situated on it for cutting, hauling, catching and manufacturing logs and lumber represented as to the creditors the capital stock paid in. Thus the stock subscribed has all been paid up. Neither the individual members, the stockholders nor their property are liable to the creditors. This substitute for and representative of the capital stock constitutes the sole fund, to which the creditors may look for the satisfaction of their demands. It is the basis of the credit, which is extended to the corporation by the public and substitute for the individual liability which exists in other cases. So far as creditors are concerned, it is regarded in law as a trust-fund pledged for the payment of the debts of the corporation. *Wood* v. *Dummer*, 3 Mason, 308; *Sawyer* v. *Hoag*, 17 Wall. 610; 1 Beach. Priv. Corp. § 116. See *Hope* v. *Salt Co.*, 25 W. Va. 789; *Lamb* v. *Pannell*, 28 W. Va. 663; *Sweeney* v. *Refining Co.*, 30 W. Va. 443 (4 S. E. Rep. 431.) See, also, Mor. Priv. Corp. § 803; Wait, Insol. Corp. § 162.

"The giving of a mortgage by solvent corporations, to secure payment to a director is viewed with suspicion, but it is legal when perfectly free from actual fraud." (Citing, among others, *Hope* v. *Salt Co.*, 25 W. Va. 789; *Hotel Co.* v. *Wade*, 97 U. S. 13). "But where the corporation is insolvent, an entirely different question arises. There has

been difference of opinion in the courts, but the weight of authority clearly and wisely holds that an insolvent corporation can not pay a debt to a director in preference to debts due others, either by turning out property to him, or by giving him a mortgage on corporate assets." Cook S. & S. & Corp. Law § 651 (see cases cited).

In this state, being *prima facie* fraudulent, I do not think that it has been shown before the commissioner by clear and convincing proof that the preference for the twenty two thousand dollars and odd was fair and reasonable to the non-preferred creditors. The outside creditors, who do not know what is going on indoors, had a right to expect from their trustees a fair and reasonable disposition of their trust-property; at least, the right to expect that their trustees would not virtually take all their trust-property to pay their own debt. If it be said that the preferred claim of Hulings & Co. of twenty two thousand dollars has been twice audited and found correct, the reply is, no one questions its perfect fairness and correctness, or that it was advanced to the lumber company when they were in great need, and before these debts of appellant were created, and upon a promise of speedy repayment; but the reply of appellants to this is, that their claims have been audited by the commissioner of the court and also found correct and to be due and payable, and, if not as old as the preferred debt, they were old enough to be in existence when the lumber company failed and made the assignment, and when the two preferred directors occupied with their co-directors the relation of trustees to the corporation and its property, and that this property was a trust-fund, pledged for the payments of appellants' claim on the same footing as the claims of other creditors at large; at least, that their trustees, also as creditors at large, could not fairly and reasonably consent to or claim the preference awarded them.

Huling and Co. advanced some eight thousand dollars to the lumber company for the purpose of lifting vendors' liens with the understanding that they were to hold these liens or purchase-money notes as security for the money thus advanced. I see no reason why the firm of Hulings &

Co. may not be allowed this item of their claim and be substituted to the rights and remedies against the respective tracts of land, which the original vendors had, but without any right of recourse in case of deficiency, as it is easily separable from the rest of their account, having been kept separate and distinct. But it must also be in subordination to the creditors under trust-deed No. 1 and trust-deed No. 2, (1) because they were large stockholders in the lumber company, one having six hundred and twenty five and one third shares, the other one hundred shares, both being directors, one also the president, the other the treasurer, and induced strangers, Mitchell & Co. and the holders by hypothecation of the mortgage-bonds to advance and lend their money on the faith; if not representation, that the two deeds of trust given to secure them were not impaired by any higher lien held by a firm composed of two directors, who were respectively president and treasurer and large stockholders; (2) because Hulings & Co., seeing the fairness of this, by their pleadings and otherwise showed themselves to be content with such subordination of their specific lien.

It is true that by supplemental answer, filed November 23, 1891, they claim a first lien on the lands on which the notes lifted by them were, in the deeds of the original grantors, retained as vendors' liens; but this was after their first answer, insisting on the validity of the Hulings or third deed of trust, after the pleadings were made up, the evidence all in, also the commissioner's report—in fact, after the land had by consent been decreed to be sold; and the best bid obtained was not enough to reach their claim. Under these circumstances, and at this stage of the case, it would not be equitable to permit Hulings & Co. to displace to that extent the mortgage bondholders, and, under the familiar doctrine and principles of subrogation, would not be allowed; and this also disposes, in advance, of their counter assignment of error No. 2.

As to the rest of their claim against the Hulings Lumber Company, they were mere general creditors; early ones, it is true, but not in any other respect standing on higher ground than the other creditors at large, As to this part

of their claim, though honest to a cent, and in every other respect, they put off securing it too long to now obtain preference over the others who occupy the same ground, except that they are subsequent in time. The board of directors, in the meeting of December 1, 1890, at which the directors Willis J. Hulings and J. E. Butler were present, passed the resolution directing the general assignment by deed of trust No. 3, reciting that the lumber company was then indebted in various sums of money, amounting in the aggregate to about the sum of one hundred and forty one thousand dollars, part of which had already matured, and that the greater portion of the residue would mature in a few days; that the company was unable to provide for the payment of the said indebtedness already matured; and proceeded to authorize and direct the assignment by which the control of its affairs and property passed out of its hands; thus showing that the corporation was insolvent, not being able any longer to meet its obligations, or to carry on the business, for which it was incorporated. It would be a strange trusteeship and strange trust-property, if such dealings with it in violation of the statute could pass muster in a court of equity; for the trust and confidence properly given by the creditors of the insolvent corporation to its trustees would be thereby violated.

Hulings & Co., appellees, make three counter assignments of error: .

(1) The Circuit Court, by its decree of 20th of June, 1891, erred in decreeing that the First National Bank of Cumberland should pay to Kenneweg & Co., defendants and appellants, the sum of nine hundred and forty seven dollars and twenty five cents, instead of directing that the same should be paid over to M. Howard Hulings, trustee.

The facts, as far as they appear, are as follows: On the 5th of December, 1890, the defendant Hulings Lumber Company had on deposit, to its credit, in the First National Bank of Cumberland, Md., the sum of one thousand three hundred and one dollars and ninety eight cents. It owed to defendant Kenneweg & Co. a negotiable note, payable at that bank, for nine hundred and forty seven dollars and twenty five cents, falling due, not counting days of grace,

on 6th December, 1890, which Kenneweg & Co. had left at the bank for collection. On the morning of the assignment, viz. 5th December, 1890, but before its execution, the lumber company, by its president, drew a check on the Cumberland Bank, payable to the cashier, for nine hundred and forty seven dollars and twenty five cents and sent it by mail to the cashier, with instructions to pay the Kenneweg note, and send the note to the office of the Hulings Lumber Company. The cashier received the check and letter but before the payment the bank had heard of the assignment and refused to apply the money to the payment of the note, for the reason given by the bank to Kenneweg & Co.—that the Hulings Lumber Company was largely indebted to the bank, and they (the bank) had been informed that the lumber company had made an assignment. We will suppose that the making of the assignment, as then in force, was communicated by the same letter. Commissioner Adams reported against the claim of Kenneweg & Co., holding that the money in the bank passed to M. Howard Hulings, trustee, by the general assignment of all property of every kind made by the company afterwards, but on the same day, viz. 5th December, 1890, for the payment of all claims and demands in the order specified. Kenneweg & Co. excepted to the commissioner's report on this point, and the court, by decree of 20th June, 1891, held the exceptions to be well taken, and ordered the First National Bank of Cumberland to pay to Kenneweg & Co. the said sum of nine hundred and forty seven dollars and twenty five cents in payment of their note.

Whether it was a fraudulent transfer of this particular fund does not arise, being nowhere raised by the pleadings or otherwise. The question when and under what circumstances the death or insolvency of the drawer of such a check has the legal effect to countermand its payment—when the check is to be regarded as an equitable assignment—has given rise to a great deal of discussion, and to some differences of opinion. It was, in this case, an order to the cashier of the bank to transfer the deposit *pro tanto* of the lumber company to the account of Kenneweg & Co., in discharge of the note of the drawer, then there for col-

lection. If the cashier or bank was the agent of the lumber company to pay, it was also the agent of Kenneweg to collect; and although the letter containing the check and instructions also contained, perhaps, the information as to the making of the trust-deed, the check having come into the hands of Kenneweg's agent to collect, it may be regarded as issued, and, as between the lumber company and Kenneweg, operated as an equitable assignment of that amount. The bank did not and does not itself claim it, and no one impeaches it as fraudulent and voidable. The bank continued to hold the check, money and note until the controversy as to the money virtually in court between Kenneweg and the trustee should be settled; so that it is a question of ownership, depending on equities, and not what the stakeholder could do. The letter is not produced. Mr. Shriver, the cashier, testifies, but is not examined on· this point. It is probable that the letter spoke of the general assignment for payment of debts, and of the preference given the bank for its debt of twenty thousand dollars and the fact of insolvency, if it then existed, was not a fact communicated, but only inferred; for the officer, who sent the check, says in his testimony, that the lumber company was not then insolvent. Although the trust-deed was afterwards acknowledged, and delivered on the same day, no express mention was made of this deposit, and it did not operate *proprio vigore* as a revocation of the check.

As a matter of honesty and fair dealing under the common usage in such matters, it is generally regarded as a fraud on the part of the drawer of a check in payment of his debts to countermand it without some good cause, and such fraud should not be encouraged by the law's approval. As a matter of public policy and general convenience, the law's approval of the unlimited right of revocation would tend to weaken confidence in checks as money, and impair the usefulness of banks as places of deposit for convenient paying, as well as for safekeeping. Regarded as an equitable assignment, it has all the elements of a contract of sale or transfer of negotiable paper without inconvenience to the bank, or undue restraint upon the proper pow-

er of revocation. So much for principle pointing to the proper rule.

As matter of authority, so long ago as 1835, in the case of *Brooks* v. *Hatch*, 6 Leigh, 534, such check or order was held to be an equitable assignment *pro tanto* of the funds thereafter to come into the hands of the drawee; citing *Row* v. *Dawson*, 1 Ves. Sr. 331; *Peyton* v. *Hallett*, 1 Caines, 363; and *Cutts* v. *Perkins*, 12 Mass. 206. In the case of *Clayton* v. *Fawcett* (1830) 2 Leigh, 19, the letter of Fawcett would have been adjudged an equitable assignment but for the condition contained in it that the payment was to depend on the drawer's being absent; citing on the subject of equitable assignment, *Duke of Chandos* v. *Talbot*, 2 P. Wms. 608; *Theobalds* v. *Duffoy*, 9 Mod. 102; and *Bates* v. *Dandy*, 2 Atk. 207. In *Anderson* v. *De Soer* (1849) 6 Gratt. 363, the same doctrine is laid down; and in *Bank* v. *Kimberlands*, (1880) 16 W. Va. 555, 558; and *Bell* v. *Alexander* (1871) 21 Gratt. 1, 6. Upon the subject of a check duly issued operating as an equitable assignment, see 2 Daniel, Neg. Inst. (4th Ed.) § 1618b, note; Id. § 1635 *et seq.; Please* v. *Landuer*, 63 Wis. 20 (22 N. W. Rep. 847); *Stoller* v. *Coates*, 88 Mo. 514; *Roberts* v. *Corbin*, 26 Ia. 327; *Union Nat. Bank* v. *Oceana Co. Bank*, 80 Ill. 212, and cases cited; *Sav. Inst.* v. *Adae*, 8 Fed. 106; *Bank* v. *Coates*, Id. 540; *Row* v. *Dawson*, and *Ryall* v. *Rowles*, 2 White & T. Lead. Cas. (4th Am. from 4th Eng. Ed.) 1531, 1533; Grant, Banks, side pp. 50, 51, citing *Tate* v. *Hilbert* (1793) 2 Ves. Jr. 111; Rev. Rep. 175, referring to *Rolls* v. *Pearce*, 5 Ch'y Div. 730, a case of *donatio mortis causa*. On same subject, see *Austin* v. *Mead*, Brett. Lead. Cas. Eq. 122; 15 Ch'y Div. 651, and *Burke* v. *Bishop*, 27 La. Ann. 465, treating the check as a mandate. On nature of a check, see 2 Daniel, Neg. Inst. c. 49, § 1566 *et seq.;* Bolles, Banks, § 58 *et seq.; Bullard* v. *Randall*, 1 Gray, 606. On nature of bank contracts and duty to pay checks, see Bolles, Banks, §§ 32, 80, *et seq.;* 2 Morse, Banks (3d Ed., by Parsons) c. 36, § 565 *et seq.* On revocation of checks, see 1 Morse, Banks, c. 28, § 397 *et seq.;* revocation by death, section 480; by insolvency, section 400a. On assignment in equity, see 1 Beach, Mod. Eq. Jur. 326; 2 Story (13th Ed.) § 1044. On the French

law on the general subject, see note 2 to section 1040a. On subject of handling a key, *etc.*, so as to enable buyer or donee to take possession, see 2 Schouler, Pers. Prop. § 67. On equitable assignment, see Id. §§ 76, 75; *Elam* v. *Keen*, 4 Leigh, 333; 1 Schouler, §§ 74, 77, *et seq.*

This is not a case of a suit at law against the bank, but in equity, where the court has the fund under its control and all the parties before it, including the stakeholder; and I do not understand any decisions of the Supreme Court of the United States as not treating it as a good, equitable assignment, as between the payee and the trustee. Certainly such is the settled rule of law in this state.

The second and third counter assignments of error have been already disposed of. Although the State may have had an inchoate lien for the taxes on these lands, yet there was none to which Hulings & Co. could be substituted by paying them, or thereby give them any other standing than that of craditors at large of the corporation.

In my view, the court should have permitted defendants Hulings & Co. to have retained the place in the order of payment given them by the deed of trust to M. Howard Hulings, trustee, so far, and so far only, as the claim reported for them by Commissioner Adams is made up of notes, *etc.*, which were secured by vendors' liens on the real estate of the Hulings Lumber Company, lifted and held by defendants Hulings & Co.; their amounts, and the several tracts of land to which they apply, to be ascertained by the court in any proper mode. As to the rest of their claim reported by Commissioner Adams, they should come last in the deed of trust, not simply in the last class. But those creditors of the lumber company who, by their answer or other pleadings, have successfully assailed the claim of Hulings & Co., are not to occupy in the order of payment out of the trust-fund the place thus made vacant; for although the settled rule in this State is that his diligence is to be rewarded who has enlarged the fund to be distributed by removing some fraudulent contrivance that has concealed it in part, or illegal preference that would, under the trust deed, have consumed it, yet the qualification of the rule is as well settled as the rule itself that such impeach-

ing creditors can not displace or lessen any prior, valid, subsisting liens which still stand as just and honest, nor can the latter be debarred of any increase of share incident to their right to retain against the trust-fund, as a whole, the place in the order of payment assigned them; for, having equal equity and a legal right, and being without fault, they are not to be thrust aside or superseded by those who come after them in the order of payment prescribed by the trust-deed. See *Guano Co.* v. *Heatherly*, 18 S. E. Rep. 611 (*infra* p.—;) *Cohn* v. *Ward*, 36 W. Va. 516 (15 S. E. Rep. 140). The deed of trust stands valid as to them, and the rule laid down in *Sweeny* v. *Refining Co.*, 30 W. Va. 443 (4 S. E. Rep. 431) and other cases, where the trust-deed was set aside *in toto*, has no application, except that it gives them preference over the displaced trust-creditors.

The decree of December 2, 1891, is reversed, and the cause remanded, with directions to modify and correct the same in accordance with the views here expressed, and, as modified and corrected, to be entered and carried into execution.