H. C. Finch, Minnie H. Steuerwald and Oscar Gilbertson,

*vs.*

Warrior Cement Corporation, a corporation of the State of Delaware; Gulf States Portland Cement Company, a corporation of the State of Delaware; A. C. Deer, as President; S. C. Steward, as Vice President; and F. W. Boley, as Secretary and as Directors, Paul S. Steward, F. A. Stephenson, Charles Closz, H. I. Prussia, J. W. Winall, of the Warrior Cement Corporation.

Alice L. Steuerwald,

*vs.*

Warrior Cement Corporation, a corporation of the State of Delaware, A. C. Deer, H. I. Prussia, F. A. Stephenson, F. W. Boley, C. S. Steward, Paul S. Steward and A. B. Wilder.

*New Castle, Feb. 8, 1928.*

Gulf was incorporated in 1918 for the purpose of manufacturing and selling cement. At the time of the transfer of its assets to Warrior, its outstanding capital was 11,425 shares of seven per cent. cumulative preferred stock, each of the par value of $100, and 9,569 shares of common stock of no par value. At that time it had outstanding a fixed bonded indebtedness of $146,000. The affairs of Gulf became such that its officers and directors concluded that something had to be done to bring new money into the enterprise before the company could hope to continue in business. Various plans looking to a reorganization and further financing were suggested but came to naught. In January, 1925, Stephenson, one of the Gulf stockholders, met the defendant A. C. Deer in Chattanooga, Tennessee. Deer was a successful cement man of practical experience, who by reason of dissension in Signal Mountain Portland Cement Company had a short time before severed his connection with that concern, he having laid out and developed the construction of its plant and served as its manager. Stephenson, who had just returned from a meeting of the Gulf directors at their plant in Demopolis, Alabama, told Deer the Gulf people

were considering a plan of reorganization or refinancing of their company and asked Deer if he was willing to formulate an offer of some reorganization scheme to the Gulf. Deer agreed to meet the directors then at Demopolis if they would come up to Chattanooga. On January 30, 1925, four of the Gulf directors with Stephenson accordingly met Deer in Chattanooga for a conference. Deer made them a proposition, but it was rejected. Thereafter Deer and the defendant C. S. Steward, who had been vice president of Signal Mountain Portland Cement Company and had severed his connection therewith, became interested together in securing location for the site of another cement company which they thought of organizing. Several sites were examined by one or the other of them, and various localities in the Selma chalk fields in Alabama were considered. In June, 1925, while Deer was in the vicinity of Demopolis, where the Gulf plant was situated, for the purpose of securing options on lands which in his prospecting he had located, he came across one of the Gulf directors who was down there for the purpose of attending a meeting of the Gulf board at Demopolis the next day. This director, the defendant Closz, tried to arrange for the directors to meet Deer, but failed. Deer, however, went over to Demopolis. Without going into details, it is enough to say that Deer and the Gulf directors reopened discussions upon the possibility of Deer's submitting a plan to rehabilitate the Gulf's affairs. The upshot was that after about three days of negotiations which involved proposals and counter-proposals, Deer submitted to the Gulf board the following proposal, which was accepted as shown at the foot thereof:

"Demopolis, Ala., June 18, 1925.

"Proposal of A. C. Deer to Gulf States Portland Cement Co.
"To Gulf States Portland Cement Co., and its Stockholders:

"I make you the following proposition:

"OPTION.

"You to give me an option for four months from and after its approval in legal form by you, to purchase all the assets, good will, and property of every description owned by the corporation, I to assume all the corporation's liabilities, upon the following terms and conditions:

"NEW CORPORATION.

"If, within the said four months, I exercise said option, I am to cause

to be chartered and organized a new corporation with a capital stock of $750,000.00, 8% preferred stock and 20,000 shares of no par common stock. All said stock is to vote equally. The new corporation is to issue $750,000.00, 7% 15 year first mortgage bonds, with a sinking fund to be provided annually for the purpose of redeeming said bonds at maturity, or earlier at any interest bearing date.

### "DISPOSITION OF PREFERRED STOCK.

"An audit of the present company's books and quick assets is to be made as of July 1, 1925. Based on this audit, plus any additions at the time this option is exercised, I am to cause the new company to pay to the present company, for its assets, etc , preferred stock of the new company, as above described, of equal value,—the said stock is to be distributed to the preferred stockholders in the present company in proportion to their stock in the present company. I estimate this will give the present holders of preferred stock from 60 to 65 cents on the dollar of their present stock, but guarantee a minimum of 60 cents on the dollar.

"The balance of the preferred stock is to remain in the treasury, subject to the control of the directors of the new company.

### "DISPOSITION OF COMMON STOCK.

"The 20,000 shares of common stock in the new company is to be issued to me, in consideration of my services in promoting the new company, assigning to it this option to buy from you, and granting to the new company the exclusive right to use in the Alabama chalk fields a waste heat dryer device or method with air seals, perfected by me. I estimate this dryer will save to the new company, as compared to the present dryer operation of the company, between 30 and 40 lbs of coal to a barrel of cement produced. This should amount to a saving of $50,000.00 to $60,000.00 per year.

"From this common stock I propose to give to the holders of common stock in the present company at the rate of ½ share to each common share of common stock held in the present company.

### "DISPOSITION OF BONDS

"I will cause the new company to contract for the sale of its bonds at a commission not to exceed 10%. I propose to actively assist in the sale of these bonds and for that purpose to aid the bond salesmen in forming a syndicate to buy the first $300,000.00 of bonds. I am to provide 6,000 shares of said common stock in the new company to be given to purchasers of these first $300,000.00 of bonds at the rate of 2 shares of common stock for each $100.00 of bonds bought.

"The prior right to buy $100,000.00 of these bonds at $95.00 per $100.00 is to be given to the stockholders in the present company for 30 days after the approval of this option. In case of oversubscription, the subscriptions shall be prorated.

"After the sale of the first $300,000.00 of bonds, I will provide the necessary common stock bonus, not to exceed 1 share of common stock for the purchaser of each $100.00 of bonds.

"Excepting the common stock delivered to purchasers of bonds and to stockholders in the present company, common stock is to be held in my name and not to be sold or transferred therefrom until the financing of the new company is completed.

### "TIME OF ORGANIZATION

"Immediately upon the approval of this option, I propose to begin the plans for the sale of said bonds, and am to cause the organization of the new company when the first $300,000.00 of said bonds have been subscribed.

### "DISPOSITION OF REVENUE FROM BONDS

"The revenue from the sale of said bonds is to be used, first in paying off the present bonds as far as necessary, and approximately $500,000.00 is to be used in rebuilding the present plant into a modern plant, substantially as per layouts heretofore submitted to the present company by me. Any balance is to be added to working capital.

### "DEER'S SERVICES

"I will serve as president and general manager of the new company, without salary, until the new plant is in production. In this capacity, I will supervise the construction of the new plant and manage the operation of the present plant until the new plant is put into operation. When the new plant is in operation, the directors are to fix my compensation.

"The new company to pay my necessary traveling expenses and other expenses incurred in carrying on the company's business.

### "BOARD OF DIRECTORS

"The directors of the new company are to be eleven in number, six of whom shall be elected from stockholders in the present company and five from new stockholders.

### "EXPENSES PRIOR TO ORGANIZATION

"All expenses prior to the organization of the company, incurred by me, shall be paid by me, and if this option is not exercised by me, I am to make no claim against the present company for any expense.

### "EXPENSES OF CHARTER, ETC.

"The expenses of obtaining the charter of the new company and domesticating in Alabama are to be paid by the new company.

### "CONSIDERATION FOR OPTION

"If I fail to exercise this option, and as a consideration for the option, I agree to deliver to the present company all blue prints, layouts, plans and data prepared by me in connection with the proposed new plant and also to

grant to the company the right to use the waste heat dryer system with air seals perfected by me.

"A. C. Deer.

"Demopolis, Ala., June 18, 1925.

"We, the undersigned directors of the Gulf States Portland Cement Co., in session at Demopolis, Ala., have carefully considered the above proposal of A. C. Deer, and investigated conditions at the company's present plant, and we hereby personally approve this proposal and recommend to the stockholders that they authorize us as directors to enter into a contract with said Deer as above outlined.

"A. Tonnar, *President.*
"Chas. Closz.
"H. I. Prussia.
"Ole K. Olsen.
"J. W. Winall.
"A. B. Wilder."

There were seven out of nine directors present, but one refused to recommend the proposition. He later, however, joined his colleagues on the board in approving the plan.

At the same meeting when the proposal was accepted, a form of letter to the stockholders was prepared and sent to all the stockholders, inclosing a copy of the Deer proposal and attaching forms for either approval of the plan or disapproval, with the request that the stockholders indicate by signing the appropriate form their assent or dissent to the proposition. Various meetings at various places were held at which explanation was made to groups of stockholders as to what the Deer proposal meant. About ninety odd per cent. of all the stockholders indicated their approval of the plan and the Gulf accordingly made the transfer of its assets to the new company, the Warrior, which Deer had caused to be formed. Stock of the Warrior instead of being delivered to the Gulf in payment for the assets was distributed direct to assenting stockholders of the Gulf. A bond prospectus or circular was sent to all the Gulf stockholders on November 2, 1925, advertising the sale of $750,000 of bonds of the Warrior called for by Deer's proposal. By the fall of 1925 all of the bonds had been sold, and by January 1, 1926, over $208,000 from the proceeds had been spent by Warrior on new construction at the old Gulf plant and by August 1, 1926, over $568,000 had been so spent. The

outstanding bonds of Gulf were also paid off out of their proceeds. The first bill was filed in these causes September 28, 1926.

The three complainants in the Finch suit did not assent to the Deer proposal and refused to exchange their Gulf stock for Warrior stock. They refused also to subscribe for their pro rata share of Warrior bonds. Without detailing the facts, it is sufficient to say that all of them had notice before about November, 1925, that the Deer plan had been carried through, that the assets had been transferred, that the stock was being exchanged, that Warrior was selling bonds to the public and was rebuilding the plant.

The complainant in the Steuerwald suit exchanged her Gulf stock for Warrior stock under the terms of the Deer proposal.

*Aaron Finger* and *Fred A. Ontjes*, of Mason City, Iowa, for complainants.

*David J. Reinhardt* and *J. J. Lynch* and *I. G. Phillips* (of Allison, Lynch & Phillips), both of Chattanooga, Tenn., for defendants.

THE CHANCELLOR. These two cases were heard together. The parties complainant, however, sue in entirely different capacities. In one of them the complainants sue as stockholders of Gulf (one of them also claims to be a creditor and sues likewise as such), and in the other the complainant sues as a stockholder of the Warrior Company. The relief asked in the respective suits is of course entirely different. Accordingly I shall in the ensuing opinion treat the two cases as distinct. First then, as to the case of

*Finch, et al., v. Warrior Cement Corporation, et al.*

In this case the complainants seek by their original bill to set aside the transfer by the Gulf of its assets to the Warrior. They attack the transfer on the ground that it was fraudulent because made without consideration in furtherance of a scheme to deprive the complainants of their rights as proportionate equitable owners of the Gulf assets and because further the directors of the Gulf in order to serve their prospective interests in the Warrior induced the majority stockholders of the Gulf to consent to the transfer by making false representations of fact. They pray that the trans-

fer and all acts done in furtherance thereof be decreed to be null and void, that receivers be appointed for the Gulf Company, that the Warrior Company shall deliver to such receivers all the property, books, etc., of the Gulf now held by it, and that appropriate injunctive relief be afforded.

The complainants filed three amendments to their bill. These amendments, so far as the introduction of new allegations of fact are concerned, amplify some of the allegations in the original bill and add as an allegation of fact certain constitutional and statutory provisions of law found in the jurisdictions of Alabama and Tennessee. As nothing was made in the argument or on the briefs of those allegations concerning the laws of those states, I pass them by as not being of moment.

The amendments add to the original bill by asking additional relief in substance as follows: That if it be not practicable to set aside the so-called sale of assets, the complainants might have a decree for damages against the defendants, corporate and individual, sustained by them by reason of the transfer and that the sum so allowed to them might be decreed to be a lien on the Gulf properties acquired by the Warrior, subordinate, however, to the lien of the outstanding Warrior bonds.

The answers deny all the allegations of the bill and its amendments by which fraud is charged to have tainted the transactions complained of, insist by averment of facts and by denials of the bill's allegations, that the proposal and all that was done thereunder was in pursuance of the laws of this state, where the corporate parties are domiciled, and in every way squared with the principle of equal and impartial treatment of every Gulf stockholder of the same class.

In view of what subsequently follows upon the subject of laches, it is unnecessary to enter upon a discussion of a great mass of facts relied upon by the complainants as a ground for rescinding the transfer because of alleged frauds in its procurement. While thus relieved of the necessity, in order to reach a decision of the case, of entering upon a discussion of the evidence preliminary to a finding upon the question of fraud charged against the directors of the Gulf Company, I do feel in view of the serious nature of the charges made that I should say this, viz.: I can see

no fraud in the administering of their duties by the Gulf directors ✓ or in Deer's dealings with them. They had no community of ✓ interest, their negotiations were all at arms' length, no class or ✓ group of stockholders was favored at the expense of others, everything that was proposed was entirely in the open, every person in interest including stockholders was fully and frankly advised upon all points, and the terms of the proposal were carried out faithfully and implicitly in obedience to all of its terms, the directors obtaining no more in the sequel than they were entitled to as stockholders, and then only in the same proportion as those who were non-director stockholders. Upon the point that Deer induced the exchange by falsely representing that he had a patented waste heat drier, concerning which so much testimony was educed, my conclusion is that the complainants' position cannot be sustained. Deer never represented that he had a patented waste heat drier. He did represent that he had *perfected* "a waste heat drier device or method with air seals," and this was true. He has since obtained a patent for the discharging device which he represented at the time of his proposal that he had perfected.

What took place between the Gulf Company and the Warrior Company assumed the form of a sale by the former of all its assets ✓ to the latter. Our statute (*Section 64a of the General Corporation Law* [as amended by 34 *Del. Laws* 1925, *c.* 112, § 13]) authorizes the sale by a corporation of all of its assets upon such terms and conditions as its board of directors deem expedient and for the best interests of the corporation when authorized by a majority of the voting stock at a stockholders' meeting called for the purpose of considering the question, or when authorized by the written consent of the holders of a majority of the voting stock; provided, however, that the certificate of incorporation may require the vote or written consent of a larger proportion of stock than a majority. The certificate of the Gulf Company did not require a greater proportion than a majority consent as authority for the sale of its assets. The rule of the majority prevailed in its case.

Apparently proceeding under this section, the Gulf board recommended a sale in accordance with Deer's proposal. Instead of calling a stockholders' meeting for the purpose of securing an authorization by the stockholders of the sale so recommended,

they resorted to the alternative plan of securing the written consent of a majority. Such consent was obtained.

Thus far the procedure of the statute was followed. But from this point on, those in charge of the business appear to have departed from the conception that a sale was being effected, for though all the assets of Gulf were turned over to Warrior, the stock of the latter which supplied the consideration was not paid to the selling corporation as it should have been. It was, instead, distributed direct to the assenting stockholders of Gulf in harmony with the plan of Deer's proposal and a proper proportion was held and is now held for the benefit of the dissentients ready for delivery if they see fit to take it. This course is sought to be justified by the Gulf directors upon the theory that what really took place was not a sale by Gulf to Warrior, but in reality a reorganization of the former, and inasmuch as the same result which the direct distribution sought to accomplish could and would have been accomplished by paying the Warrior stock to Gulf and then had it distributed by the latter through dissolution proceedings, no objection to the transaction ought to be allowed. I cannot accede to this proposition. If the Gulf Company undertook in substance to effect a reorganization of itself, and the statutory provision governing a sale of all corporate assets was resorted to as a suitable method, it would be laying down a dangerous rule to hold that at the last and consummating stage of the business the statute's scheme might be entirely abandoned. If what is done comports in every way with the statute's requirements then of course an objecting stockholder can interpose no obstacles. But where the only authority for the action rests on the statute, it would in matters of the instant kind, be exposing various interests both of stockholders and possible creditors to too great a risk of injury to allow the statutory authorization of a sale to be discarded short of its full and completed exercise. If the majority insisted on a sale as the method of reorganizing this company's affairs, the complainants as stockholders were entitled to insist that the sale which was being forced upon them, and not something else, should constitute the entire extent of their submission. There is no way to compel the complainants to exchange their Gulf stock for Warrior stock. If the Gulf had received the Warrior stock as the

consideration for its assets and could then upon dissolution have distributed it in kind, of course the complainants in the absence of any countervailing circumstances could have been forced to submit to becoming Warrior stockholders or lose all their rights. But that not having been done, how can the complainants be now driven to the position of becoming Warrior stockholders or lose all interest in the assets which formerly lay underneath their stock? They now find themselves in the situation of stockholders in a company whose entire assets have been disposed of to another and their company owns nothing in place thereof. This being so, they are entitled to some sort of relief.

To what sort of relief then are they entitled? They say first that they are entitled to have the entire transaction set aside. This, it seems quite clear, they should not have. They have waited too long to ask it. They filed their bill on September 28, 1926. They were informed at least about ten months in advance of filing their bill of what was proposed to be done and was in fact being done. The transfer of the assets was made, first mortgage bonds upon the property in a large amount were being sold to the public, from the proceeds $146,000 of their own company's bonds were proposed to be and were paid off, and new construction and the tearing out and renovation of old construction at the plant were being paid for. If the complainants desired that their company should recover the assets and continue the business, they should have acted promptly and not have sat by while the purchasing company and the new interests were altering their situation in a most substantial manner. Inasmuch as there was no actual fraud or bad faith in the transaction, the equity which underlies the doctrine of laches appeals with especial persuasiveness for recognition here. On this aspect of the case, therefore, the conclusion is that the complainants as stockholders have delayed too long to be granted the relief of rescission and restoration. *Marks v. Merrill Paper Mfg. Co.*, (*C. C.*) 188 *F.* 850, *on appeal* (*C. C. A.*) 203 *F.* 16; *Tanner v. Lindell Ry. Co.*, 180 *Mo.* 1, 79 *S. W.* 155, 103 *Am. St. Rep.* 534; *Johnson v. United Rys. Co. of St. Louis, et al.*, 227 *Mo.*

423, 127 *S. W.* 63; *Wright v. Tacoma Gas & Electric Light Co.*, 53 *Wash.* 264, 101 *P.* 865; *Berkeley County Court v. Martinsburg, etc., Co.*, 92 *W. Va.* 246, 115 *S. E.* 448; *Dana v. American Tobacco Co.*, 73 *N. J. Eq.* 736, 69 *A.* 223; *Venner v. Chicago City Ry. Co.*, 236 *Ill.* 349, 86 *N. E.* 266; 3 *Cook on Corporations (7th Ed.)* 732. I have examined all the cases cited by the complainants upon the subject of laches and find nothing in them at variance with the conclusion just stated.

But a refusal to grant the relief of cancellation does not mean that the complainants as stockholders are to be deprived of any relief whatever. The alternative prayer of their amended bill is that, in event cancellation is not decreed, they be awarded a decree for damages and a lien. That they are entitled to a decree for damages in an amount representing the value of their stock based upon its proportionate share of the total net assets of the company is a form of relief to which they are entitled. *Tanner v. Lindell Ry. Co., supra; Lauman v. Lebanon Valley R. R. Co.*, 30 *Pa.* 42, 72 *Am. Dec.* 685; *Jones v. Missouri-Edison Electric Co., (C. C. A.)* 144 *F.* 765; *Petry, et al., v. Hardwood Electric Co.*, 280 *Pa.* 142, 124 *A.* 302, 33 *A. L. R.* 1249.

What then is the value of the complainants' shares which should be allowed them as compensation? The complainants own both preferred and common stock of the Gulf Company. The evidence upon this question of value is exceedingly voluminous. To undertake to review it and critically examine it would extend this opinion to an inordinate length. It has to do with the values to be placed on the company's tangible properties, consisting of rock and sand deposits, coal mines, plant and equipment, with location, transportation and power facilities present and prospective, past history of the properties in the hands of present and prior owners, ability and inability of the business to yield profits, financial perplexities of the Gulf Company, etc., from the total of which liabilities are to be deducted. No evidence was produced showing market value of the shares. Deer's proposed price was predicated on the value of these assets. While the proposal does not in terms say so, yet by plain inference and by what was done in carrying it out, it is apparent that net value of assets was what was meant. An audit, which happened at the time to be already

in the course of preparation by the Gulf's regular auditor, was referred to as supplying the information upon which the price to be paid should be determined, Deer guaranteeing not less than sixty cents on the dollar for the preferred stock. The completion of the audit showed the net assets to have a value which worked out to a trifle less than the guaranteed sixty cents on the dollar for each share of Gulf preferred stock, the common of course being worth nothing. The validity of this audit is vigorously assailed by the complainants who contend that the true net value of the assets would give to the preferred stock a per share value equal to par and accrued dividends. A pivotal point upon which the controversy touching value turns, respects the proper appraisal to be made of the company's tangible assets of quarry, coal mines, plant and equipment. The complainants rely on the so-called Manufacturers' Appraisal report prepared as of December 31, 1920, supplemented by additions since that date. This report appears never to have been so seriously regarded by the directors to warrant its incorporation in the books of the company. A later appraisal was made by the American Appraisal Company as of July 1, 1923, two years before negotiations with Deer were ever thought of. This report the directors accepted as authoritative for the company and accordingly entered it upon its books. These two reports furnish the respective starting points from which the parties reach their divergent results upon the question of values. I accept the view that the appraisal made by the American Appraisal Company is the one that should govern, because while neither was made with the Deer proposal in mind, yet the latter was, without any thought of Deer and his proposal, accredited by the responsible managers of the corporation as correct. In the presence of such pronounced conflict of views between expert witnesses upon the question of values, given now that a controversy has arisen, I think that the judgment of the directors, dispassionately formed when harmony prevailed in the corporation, by which the American Appraisal report was emphatically approved as against the prior one, should be accepted. I may say further that the experts who appeared as witnesses at the trial in support of the American Appraisal report impressed me at least as favorable as those experts who appeared in support of the higher appraisal previously

made by the Manufacturers' Appraisal Company. Some allowance is also to be made for the lapse of time intervening between the two reports. The reports in question were supplemented by aduits made by auditors engaged by the respective parties. Without going into details touching the audits, this should be said. The audit made by Christian for the Gulf Company was in the regular course, he having been engaged by the company to do that work for a number of years past, and he happened to be in the midst of it again when the Deer negotiations were opened. The auditor engaged by the complainants was specially engaged to appear as a witness in this suit, and his testimony at points quite frankly reveals that he was aiming to give as rosy a complexion to the figures as he possibly could.

Now having before them the appraisal which they had disinterestedly and in the exercise of their best judgment previously accepted and also the report of their auditor, the directors concluded that the net assets of this corporation would yield in value not more than enough to pay sixty cents on the dollar to each share of preferred stock. It is important to remember in this connection that the evidence, instead of showing that the directors had some peculiar personal interest of their own to serve in forming whatever judgment they did, or some personal advantage to gain by their action, shows the contrary to be true. If they made a bad bargain, they injured themselves as well as others. The same is to be said of the ninety odd per cent. majority of stockholders who approved of the proposition. In this respect the situation is similar to that found in *Robinson v. Pittsburgh Oil Refining Corp., et al.*, 14 *Del. Ch.* 193, 126 *A.* 46, where the presumption was accepted that the controlling authorities of the corporation were, in making a sale of assets, actuated by a bona fide regard for the interests of the corporation. If there is any fraud in this transaction, viewing it as a sale, it can only be in the fact that a price was named which was so far below a fair price as to indicate fraud in law. Certainly there is no warrant in concluding that there was actual fraud. Nor, in the light of the evidence touching values, the company's financial condition, its earning power present and past, and the presumption in favor of the bona fides of both the directors and majority stockholders, can I reach the conclusion that a price

yielding sixty cents on the dollar of preferred par value was so far, if any, below the fair value as to indicate fraud in law.

The finding accordingly is that the preferred stock was at the time of the transfer of the assets worth sixty cents on each dollar of its par and the common stock was worth nothing.

The complainants are holders of both preferred and common stock and are entitled to a decree to the extent just indicated. How the sum allowed shall be secured to them, whether by lien, through the instrumentality of a receiver or otherwise, the solicitors may perhaps agree upon. If not, a hearing upon the form of the decree will be had.

One of the complainants claims to be a creditor of the Gulf Company. The defendants say that if he is such, they are not advised of the fact and are willing, if he can show himself to be a creditor, to pay him in full. If he is a creditor, his situation is entirely different from that of a stockholder, and entirely different principles touching both rights and remedies are applicable to him in that status. I suggest that satisfactory bond be given him to secure whatever he might be able to recover in an action at law as a means of obviating the necessity of resorting to further proceedings in this suit for the ultimate recovery of what he claims to be due. If the defendants cannot suggest a satisfactory way of protecting the complainant who thus claims to be a creditor of the Gulf Company, it will then be in order for me to consider the matter further.

The foregoing disposes of the case of *Finch, et al., v. Warrior Cement Corporation, et al.* I now take up the case of

*Steuerwald v. Warrior Cement Corporation, et al.*

In this case the complainant sues as a stockholder of the Warrior Company. She holds fourteen shares of its preferred stock and six shares of its no-par common stock. The amended bill seeks the cancellation of the twenty thousand shares of no-par common stock which the Warrior Company issued to Deer in pursuance of the plan outlined in Deer's proposal to the Gulf Company, or, in case cancellation of all or part of the stock be not decreed, an accounting by Deer for the value of the shares uncancelled. The amended bill seeks also to hold the defendant Deer accountable

for $26,000 and the defendant Paul S. Steward for $7,500 received by them respectively from the brokers who sold the bonds of the Warrior Company (referred to in Deer's proposal to Gulf) as commissions upon that portion of the issue which they sold or assisted the brokers in selling. The amended bill has therefore two aspects which will be considered in order.

First, then, as to the right of the complainant as a Warrior stockholder to secure a cancellation of or accounting for the twenty thousand shares of no-par common stock issued to Deer in obedience to the plan outlined in his proposal. It is contended that this stock was issued without any consideration. It being no-par stock the amount of the consideration received for it is of no moment, provided the quality of the consideration was such as to meet the constitutional requirement. *Bodell v. General Gas & Electric Corp.*, 15 *Del. Ch.* 7, 132 *A.* 442. A portion of the consideration which Deer offered for the stock was clearly not a lawful one. I refer to that part which constituted an agreement to render future services to the company of one kind and another. *Cooney Co. v. Arlington Hotel Co.*, 11 *Del. Ch.* 286, 101 *A.* 879; *Scully v. Automobile Finance Co.*, 12 *Del. Ch.* 174, 109 *A.* 49; *Bowen v. Imperial Theatres, Inc.*, 13 *Del. Ch.* 120, 115 *A.* 918. The part which embraced the right to use the waste heat dryer device which Deer had perfected and subsequently patented was, I incline to think, a lawful consideration. But assuming that it was not and that no consideration whatever was given by Deer for the stock, is the complainant in position to complain? She knew exactly what stock the Warrior Company proposed to give to Deer in consideration of all that he proposed to do. The letter to the stockholders reached her containing a copy of the Deer proposal. Before exchanging her Gulf stock into Warrior stock she addressed a lengthy letter of criticism to the Gulf Company's president, and asked to be enlightened upon several important aspects of the proposal. The treasurer of the Warrior Company, to whom the letter was handed for attention, replied lengthily to her communication, and further correspondence ensued. She was eventually advised that the transaction had gone forward to completion, by which the Warrior took over the Gulf assets, and was informed in great detail concerning the issuance of the twenty thousand shares

of no-par common stock to Deer and what distribution Deer proposed to make of it, how many shares the holders of old Gulf common would receive, how many shares would go to those putting new money into the corporation and approximately how many Deer would retain for himself. With the fullest information thus frankly laid before her, she exercised her right to exchange her shares of Gulf, preferred and common, for Warrior stock, receiving fourteen shares of preferred and six of common, which she now holds. The common stock thus received was her allotment, under the Deer plan, out of the twenty thousand shares which she knew Deer was to receive. She thus not only knew of the circumstances attending the issuance of the shares to Deer before becoming a stockholder of Warrior, but in the most emphatic way approved thereof and assented thereto by taking her proper portion in the exchange. If creditors' rights were being asserted against the issuance of the stock to Deer, we would be confronted with an entirely different situation from that which we have here, where a stockholder seeks to undo that which her prior conduct, based on full knowledge, shows she had agreed to and participated in. Acquiescence and participation in an issue of stock, without consideration or for an insufficient consideration, will bar the right of the assenting stockholder to complain against its issuance. In this state the issuance of stock without consideration does not render the issue void, though an attempt to exempt the issue from liability to pay lawful consideration therefor is void. *Du Pont, et al., v. Ball, et al.,* 11 *Del. Ch.* 430, 106 *A.* 39, 7 *A. L. R.* 955; *Scully, et al., v. Automobile Finance Co., et al.,* 12 *Del. Ch.* 174, 109 *A.* 49. The dictum found in *Ellis v. Penn Beef Co.,* 9 *Del. Ch.* 213, 80 *A.* 666, that stock issued without consideration is absolutely void appears thus to be not expressive of the law, as was recognized by the Chancellor who uttered it in the later case of *Scully, et al. v. Automobile Finance Co.,* just referred to. That stockholders who, with full knowledge, acquiesce in or ratify an illegal issue of stock, may thereafter be estopped from complaining against it, though not expressly so decided in this state, yet seems to have been accepted as true in the judicial discussions found in the recent Supreme Court case of *Henderson, et al., v. Plymouth Oil Co., et al.,* 141 *A.* 197, *post p.* 347, and in the earlier cases of *Cahall*

*v. Lofland, et al.,* 12 *Del. Ch.* 299, 114 *A.* 224, before the Chancellor, and in the same case before the Supreme Court reported in 13 *Del. Ch.* 384, 118 *A.* 1. If mere acquiescence with knowledge will estop a stockholder, a fortiori acts of participation will do so. I accordingly hold that the assent and active participation on the part of the complainant, manifested by her exchange of Gulf stock for Warrior stock with full and complete knowledge of all the facts, bar her from any right to complain against the issuance of the twenty thousand shares to Deer, even though it be conceded that no or an inadequate consideration was paid by him therefor. 1 *Cook on Corporations,* (8*th Ed.*) § 39; 5 *Fletcher, Cyc. Corp.,* § 3586; 14 *C. J.* 477, § 696.

Second, as to the complainant's right to secure in behalf of the Warrior Company an accounting and payment by Deer and Paul S. Steward of the profits obtained by them as commissions on the sale of the bonds. Deer was a director and president and Steward a director of the Warrior Company. Before the company was formed Deer made his proposal to the Gulf Company. One of the terms of the proposal was that first mortgage bonds in the amount of $750,000 should be issued by the new company (Warrior). "I will cause," he stated in his proposal, "the new company to contract for the sale of its bonds at a commission not to exceed ten per cent. I propose to actively assist in the sale of the bonds and for that purpose to aid the bond salesmen in forming a syndicate to buy the first $300,000 of bonds." This representation was made to the Gulf directors and by them passed on to the Gulf stockholders, who were invited to become Warrior stockholders. So far as the record shows, it is all of the information which Deer gave to the prospective stockholders of the new company concerning his relations to the bonds and their sale. The naming of a commission of not to exceed ten per cent. certainly did not mean that the officers and directors of the new company should not dispose of the bonds at less than a ten per cent. cost if possible. If the bonds could have been sold for a less commission than that, it was the duty of the officers and directors to secure for the Warrior a better figure. When the Warrior was formed its directors authorized a contract with Luckadoo and Elmore, brokers, by which the latter were to undertake the sale of the bonds for a commission of ten per cent.,

the outside figure named in Deer's proposal. The propriety of that contract is not assailed. It appears, however, that the brokers paid to Deer, president, and Paul S. Steward, director, commissions amounting to something in the neighborhood of $33,500, of which $26,000 went to Deer and $7,500 to Steward, for their assistance in the sale. I do not see how these commissions can be retained by the recipients. Deer's statement in the proposal gives the distinct impression that his active assistance in connection with the sale of bonds was a part of the service he would render in consideration of the acceptance of his proposal under which he was to receive all the new company's common stock, a considerable portion of which he would personally retain. Such is the reasonable interpretation to put upon the language of his proposal.

But aside from that, there are principles applicable generally to the fiduciary relations existing between officers and directors of a corporation on the one hand and the body of its stockholders on the other, which require that the profit made by Deer and Steward should be surrendered to the corporation. Those principles are laid down by the Supreme Court of this state in *Lofland, et al. v. Cahall*, 13 *Del. Ch.* 384, 118 *A.* 1, as follows:

"1. Directors of a corporation are trustees for the stockholders, and their acts are governed by the rules applicable to such a relation, which exact of them the utmost good faith and fair dealing, especially where their individual interests are concerned.

"2. They have no right to compensation for services rendered within the scope of their duties as directors, unless it is authorized by the charter, by-laws, or the stockholders of the company.

"3. They have no right to compensation for services rendered outside their duties as directors unless there had been an express contract to pay for such services, or, as some cases hold, unless the services were clearly outside their duties as directors and performed under circumstances sufficient to show that it was understood by the proper officers, as well as by the directors claiming compensation, that the services were to be paid for by the corporation.

"4. A contract to pay compensation for such services must be made with directors, or other proper corporate officers who have no personal interest, directly or indirectly, in the contract, and who are competent to represent the company in the transaction."

There is certainly nothing in connection with Deer that renders these principles inapplicable to his situation; nor can I find

anything rendering them inapplicable to the situation of Paul S. Steward. The reason which underlies the rule forbidding officers and directors to profit themselves at the expense of the corporation is the same which underlies the law's strict requirement that a trustee shall not be allowed to profit himself in administering the affairs of his *cestui que trust.* It is, that self-interest shall in no wise be permitted to conflict with duty for fear that the motive to serve the former will outweigh the sense of obligation to obey the latter. Now in this case, the directors were under the duty of contracting for the sale of the bonds at the best price obtainable. The cost was not to be over ten per cent.—less if possible. If directors who authorized a ten per cent. contract with brokers should be permitted to share in the commission, why may it not be said that they were, consciously or unconsciously, induced to favor such a contract by the prospect of their personal gain? Was not the corporation entitled to thave them pass their judgment upon the proposed contract without the interposition of the selfish prospect of obtaining a personal gain? It will not do to say that the ten per cent. flotation charge was a reasonable one. The question is, Was it the best that could reasonably have been obtained? It is manifest that, to the extent of the commission paid to Deer and Steward, the brokers were content to take less than the specified ten per cent. Why, then, may not the sum paid to Deer and Steward be regarded as paid at the expense of the corporation? If it be answered that except for the aid rendered by Deer and Steward the brokers could not have sold the entire issue, the answer is that Deer and Steward were directors and as such under a duty to render aid in securing capital for the company. *Lofland, et al. v. Cahall, supra.*

I am aware that the Supreme Court in the *Lofland Case* used language (*page* 391) from which the inference might be drawn that if the services rendered by the directors in securing the sale of their company's stock or bonds were such as to amount to "exceptional or extraordinary efforts," it might be proper for them to receive compensation for such services. But this is only an inference. If it was meant to express the settled view of the court, however, I think in this case, as the Supreme Court thought in that case, that the services rendered are not shown to have been such

exceptional or extraordinary ones as to warrant the taking of a profit therefor. Besides, it would seem from the language of the Supreme Court in the *Lofland Case* that profiting directors were not competent to themselves put the value on their own services. But aside from that, the services rendered in this case do not appear to have required the exertion of any more exceptional or extraordinary efforts than did the services rendered in the *Lofland Case;* and certainly they were far less exceptional or extraordinary in character than were those referred to in detail in the case of *Western States Life Assurance Co. v. Lockwood, et al.*, 166 *Cal.* 185, 135 *P.* 496, which was heard on a second appeal and again elaborately discussed by the California Supreme Court in the opinion reported in 173 *Cal.* 734, 161 *P.* 498. In the two opinions filed in that case all the arguments which are here advanced in support of the right of Deer and Steward to take the commissions were noted and rejected by an undivided court. See, also, as bearing on the subject, 4 *Fletcher, Cyc. Corp.*, §§ 2303, 2319, and cases cited.

Deer and Paul S. Steward should be decreed to account for and pay to the defendant, Warrior Company, the amount of profits which they received as commissions. I do not recall any evidence in this voluminous record to the effect that any other directors received such commissions. If there is any such evidence, I suggest that it be pointed out by the complainant's solicitors before a decree is entered. I suggest also to the solicitors that they agree upon the exact amount which the evidence, undisputed as it is, shows Deer and Steward to have received, before a draft decree is presented. If they cannot agree, a hearing at chambers will be accorded.