## CHARLESTON.

COUNTY COURT OF BERKELEY COUNTY v. MARTINSBURG & POTOMAC TURNPIKE COMPANY *et al.*

Submitted November 1, 1922.    Decided November 11, 1922.

1.    CORPORATIONS—*Board of Directors Empowered to do all Things Proper in Conduct of Corporation. Unless Inhibited by Statute, Charter or By-Law.*

      Generally, when not inhibited by statute, charter or by-law, the Board of Directors of a Corporation has power to do all things that are proper to be done by the corporation.    (p. 251).

2.    SAME—*Stockholder Seeking to Enjoin Executed Contract as Ultra Vires, Must Act Promptly.*

      A stockholder in a corporation, who seeks to enjoin the carrying out of a contract made on behalf of the corporation, on the ground that it is beyond the power of the corporation to make it, must act promptly and not wait an unreasonable time. If he postpones his complaint an unreasonable time, after full knowledge or with means of full knowledge, and the contract has been substantially performed, equity will deny him relief. (p. 252).

3.    TURNPIKES AND TOLL ROADS—*Beneficial Agreement of Turnpike Company for Use of its Right of Way Held Not Ultra Vires.*

      An agreement between a Turnpike Company and a Lime Company whereby the Turnpike Company grants to the Lime Company the right to use a small portion of its right of way for a tramway, in consideration of which the Lime Company

is to widen and permanently improve a portion of the Turn-
pike Company's road, and which does not disable the Turn-
pike Company from performing its functions, but on the con-
trary, enables it the better to do so, is not beyond the power
of the Turnpike Company.   (p. 252).

Appeal from Circuit Court, Berkeley County.

Suit by County Court of Berkeley County against the
Martinsburg & Potomac Turnpike Company and the Security
Cement & Lime Company to restrain last-named defendant
from constructing a railway over turnpike and from placing
any obstruction thereon.   From an order dissolving the in-
junction, plaintiff appeals.

*Affirmed.*

*Herbert E. Hannis* and *D. H. Rogers,* for appellant.
*H. H. Emmert* and *J. O. Henson,* for appellees.

MEREDITH, JUDGE:

On December 5, 1921, the County Court of Berkeley county
obtained a temporary injunction restraining the Security
Cement & Lime Company from constructing a railway along
and over the Martinsburg & Potomac Turnpike and from
placing any obstruction thereon until the further order of
the court.   The defendants, Lime Company and Turnpike
Company, filed their answers and certain affidavits, and on
motion, the injunction was dissolved.   The County Court ap-
pealed to this court.

The Martinsburg & Potomac Turnpike Company was in-
corporated by special act of the Legislature of Virginia,
March 17, 1849, chapter 176.   By amendment, February 25,
1850, Acts of Virginia Legislature, 1849-50, chapter 128, the
width of the carriage way was fixed at not less than sixteen
feet.   The road extends from Martinsburg to a point on the
Potomac river opposite or near the Town of Williamsport,
Maryland.   It was improved and has been in use for many
years.   Three-fifths of the stock of the company is owned by
the plaintiff County Court.   Its Board of Directors consists
of five members.

The Security Cement & Lime Company owns a large area of limestone land located along the turnpike and on both sides of a branch of the Baltimore & Ohio Railroad. The railroad is elevated there by means of a fill, and crosses the turnpike on a concrete bridge. By reason of the fill the Lime Company can not construct a tram-way so as to cross the railroad at grade. To carry its material from its property on the north side of the railroad to its works on the south side it must haul it in trucks or by other means over and along the turnpike and cross the railroad through the underground crossing. An agreement was made between the Turnpike Company and the Lime Company, dated August 31, 1921, executed September 17th and recorded September 20th, whereby the Turnpike Company granted to the Lime Company for the period of fifty years the privilege to construct, maintain and operate a tram-way on and over its turnpike for a distance of about 240 feet, but not more than 275 feet, under the said railroad bridge, commencing at a point about 92 feet from the north wall of the bridge and extending for a distance of about 109 feet south of the south wall of the bridge, as shown on the plat attached to the agreement. The Lime Company on its part agreed: (1) to construct the tram-way as located on the plat, to be two feet in width, the eastern rail of which should not be more than three feet from the eastern wall of the bridge, the rails to be laid flush with the concrete turnpike road, and to enter upon the Turnpike Company's property at a point about 92 feet from the northern wall of the bridge, and leave its property at a point about 109 feet from the southern wall of the bridge; (2) to build and maintain a concrete road for the Turnpike Company in place of its present turnpike road for a distance of 275 feet extending under the bridge and for a distance of 99 feet north of the north wall of the bridge, and 139 feet south of the south wall of the bridge; the entire width between the east wall and the west wall of the bridge to be concreted, and the sections extending north and south from the bridge to be concreted a width of not less than twenty feet; the road to be properly ditched, drained and constructed

so that the drain through the viaduct shall be on the east side thereof and on that part of the road over which the privilege therein is granted; the Lime Company is to keep in repair, during the life of the contract, the part of the road to be built by it; (3) the Lime Company is to be liable for any damage that may be done to any person or property of any person by reason of the construction, operation or maintenance of the tram-way; (4) no engine propelled by steam is to be operated over the tram-way, and no trains are to be operated over it at a greater speed than ten miles per hour, and every train is to be equipped with proper signals, both front and rear. All the work is to be done under the supervision of and subject to the approval of the superintendent of the Turnpike Company.

The Lime Company at a cost of upward of $4000 constructed the concrete road provided by the contract a distance of 275 lineal feet, twenty feet wide, except under the bridge it was laid twenty-three feet wide, leaving a space of seven feet to be laid along and on the turnpike under the bridge on the side upon which the tram-way was to be placed; the tracks there were to be laid on concrete and flush with it. It had its material ready to concrete this space and lay its tracks when the plaintiff obtained its injunction.

The grounds alleged for the injunction are: (1) fraud in the procurement of the contract; (2) want of authority in the Board of Directors of the Turnpike Company to make the contract; (3) want of authority in the Turnpike Company to make it; and (4) the creation of a dangerous obstruction in the Turnpike road.

1. The first ground, or charge of fraud in the procurement of the contract, may be dismissed without comment, further than to say that there is not the slightest fact shown to substantiate it. The contract was entered into in good faith on the part of both parties; it is fair in its terms, and is certainly one beneficial to the Turnpike Company.

2. As to the lack of authority in the Board of Directors to make the contract; the act incorporating the company made it subject to the statute prescribing general regula-

tions for the incorporation of turnpike companies; that general statute, passed February 7, 1817, Virginia Code, 1819, Vol. 2, page 213; chapter 234, section 5, provided:

"The president and directors, thus chosen, shall have the power to receive the subscriptions for the residue of shares required to make up the capital stock of the company; to make contracts with any person or persons, on behalf of the company, for clearing, opening, and improving the road, and performing such other work, respecting the same, as they shall judge necessary and proper; to require from subscribers, from time to time, such advances of money on their respective shares as the wants of the company may demand, until the whole of their subscriptions shall be advanced; to call, on any emergency, a general meeting of the subscribers, giving one months notice thereof in one of the newspapers printed at or near the place appointed by the stockholders for their general meeting; to appoint a treasurer, clerk and such others officers as may be necessary; to sign and settle all accounts and to transact all the business of the company during the intervals between the general meetings of the same."

Thus we see that by the very charter of incorporation the President and Directors were given very broad powers; but aside from this, the Board of Directors, are, as to all purposes of dealing with others, the corporation itself. When convened as a Board, as they were in this case, all the directors being present and voting for the execution of the contract, they are the possessors of all the powers of the corporation. What they do as agents or representatives of the corporation is deemed to be done by the corporation. *Hulings* v. *Hulings,* 38 W. Va. 351, 18 S. E. 620. There are some things that the Directors can not do without the consent of the stockholders holding a certain percentage of the capital stock; our statute, section 83, chapter 54, Code, provides that on the affirmative vote, in person or by proxy, of the holders of at least 60 per cent of the outstanding capital stock, a corporation may sell in good faith *all* its property

and assets, but the contract called in question here is in no sense a sale of all the assets of the Turnpike Company. If the Board of Directors had to have the assent of the stockholders to enter into such a contract as this, there would be little need for a Board of Directors. The business of the company might as well be managed by the stockholders in the first instance. Section 49, chapter 53, Code, the chapter treating of general provisions concerning corporations, provides that "For every corporation subject to this chapter there shall be a board of directors who shall have power to do or cause to be done, all things that are proper to be done by the corporation."

In speaking of the powers of the boards of directors of corporations, Cook on Corporations, Vol. II, sec. 712 (5th ed.) says:

> "The Board of Directors have the widest powers. All of the various acts and contracts which a corporation may enter into are entered into by and through the board of directors. The board of directors make or authorize the making of notes, bills, mortgages, sales, deeds, liens and contracts generally of the corporation. They appoint the agents, direct the business, and govern the policy and plans of the corporation. The directors elect the officers, and in this connection it may be added that at common law there is no limit to the number of offices which may be held simultaneously by the same person, provided neither of them is incompatible with any other. They may institute, prosecute, compromise, or appeal suits at law and in equity which the corporation brings or has brought against it."

All the directors, including the three elected by plaintiff, concurred with the others and voted authority to the president to execute the contract. It thus became as binding on the corporation as it would have been had all the stockholders assented to it.

3. But conceding that the formal execution of the contract in that respect can not be questioned, yet plaintiff contends that the corporation has no authority to make it; that it is

*ultra vires,* beyond its power to grant the use of any portion of its right of way for a tram-way. The county court institutes this suit in its dual capacity,—as stockholder in the Turnpike Company and as a county court charged with looking after the public rights in the public roads of its county, including the Turnpike. As a stockholder it ought not to be heard. It knew or had abundant opportunity to know all about the contract and the work as it progressed. The contract was recorded in the office of its clerk September 20th. The work was begun and practically all the travelled portion of the road, that is, the part that will be used by the general public, was permanently improved. It waited too long. Equity will not allow a stockholder, with notice of a contract which he complains of as *ultra vires,* or with the means of becoming acquainted therewith, to wait an unreasonable length of time, with the view to ascertaining whether the contract will result profitably, and then repudiate it if he finds it will result in loss. *Boyce* v. *Montauk Gas Coal Co.,* 37 W. Va. 73, 16 S. E. 501.

But granting that the county court has the right to maintain the suit, still the contract is not *ultra vires.* Instead of rendering the Turnpike Company less able to perform its functions and to use its franchise it is clearly shown that it is made more able to do so. A wider and better road bed is provided. Instead of a worn out road of fifteen feet, it is furnished a permanent road bed twenty feet wide throughout the 275 lineal feet, except under the railroad bridge, where it is now twenty-three feet wide, and will be thirty feet wide when completed. The Turnpike Company is at no expense for magintenance. Under the law it is now required to maintain its road at a width of only fifteen feet. If it is increased to twenty feet or more, the public can not complain of failure to comply with its franchise. So we hold the contract is not *ultra vires,* and the Turnpike Company, through its board of directors, had a right to make it.

4. But granting all we have said, if the proposed use of the right of way should result in creating a dangerous obstruction to the Turnpike, then plaintiff would have the right

to prevent it. The county court is charged with the duty of seeing that the Turnpike Company keeps this road open for public use and that it is kept free from dangerous obstruction. But after careful consideration of the whole record, we are fully satisfied that the road at this underground crossing will be reasonably safe for travel of all kinds. The pass-way is to be thirty feet wide fully paved; there will be no dangerous side ditches. When this tram-way is not in actual use, the whole pass-way can be used by the public. It is shown that an automobile, a wagon loaded with hay and a train load of cars on the tram-way may be safely driven through the pass-way at the same time. More room will be provided under the new plan than the old, and we have no doubt that the new plan furnishes a better and safer road than the old. The Lime Company's use of the easement granted it is carefully guarded in the contract, the rights of the public fully protected. The Lime Company has the right to haul its materials over this portion of the road on heavy trucks without charge, as there is no toll-gate there. This tram-way will relieve the road from that burden and inconvenience, and the public will be saved from danger on that score. Much more might be said, but we think the foregoing is sufficient to justify our conclusion, which is to affirm the decree, dissolving the injunction.

*Affirmed.*