BAKER et al. v. SPOKANE SAV. BANK et al.

SMITH et al. v. SAME.

No. 7361.

Circuit Court of Appeals, Ninth Circuit.

June 4, 1934.

488

John P. Gray and W. F. McNaughton, both of Coeur d'Alene, Idaho, and R. W. Nuzum, of Spokane, Wash., for appellants Baker et al.

Fred B. Morrill, of Spokane, Wash., for appellants Smith et al.

E. J. Farley and B. A. Farley, both of Spokane, Wash., for appellee Spokane Savings & Loan Soc.

R. P. Oldham and Simon Wampold, Jr., both of Seattle, Wash., for other appellees.

Before WILBUR and SAWTELLE, Circuit Judges, and ST. SURE, District Judge.

**WILBUR, Circuit Judge.**

This is an appeal from a decree dismissing stockholders' bill in equity. The court predicated the dismissal upon the ground that the bill on its face shows laches. The motion to dismiss was also based on the ground that the bill did not state facts sufficient to constitute a cause of action. Consequently, this point is also presented by the appeal from the decree. The appellee does not question the sufficiency of the facts alleged in the bill to constitute a cause of action, but does claim that the decision of the Supreme Court of Washington in Beutelspacher v. Spokane Sav. Bank, 164 Wash. 227, 2 P.(2d) 729, is res judicata. We will therefore assume that the bill does state a cause of action although in passing upon the question of laches it will be necessary to consider the nature and character of the action and of the relief demanded.

The bill in equity, which we will hereinafter refer to as the complaint in conformity with the usual practice in the state of Washington where this action was brought, alleges that the plaintiffs are members of the Spokane Savings & Loan Society, and that they are bringing this action on behalf of all members similarly situated and on behalf of the society in which they are members. They invoke federal jurisdiction on the ground of diversity of citizenship. The complaint alleges that in the early part of 1929 or prior thereto the directors of the Spokane Savings & Loan Society, which we will hereinafter refer to as the "society," conceived the idea of converting the institution into a savings bank. At that time most of the directors of the society were also directors in a trust company known as the Security Trust Company of Spokane. The charter of this company had been purchased in 1926, by these directors, as individuals. This trust company had since been doing business in the same building as the society. It was planned to convert the trust company into a savings bank and to transfer the assets of the society to the bank. In pursuance of this plan, the directors of the trust company, on May 3, 1929, secured the approval of the stockholders of the trust company to amendments of the articles of incorporation changing its name to "Spokane Savings Bank" and increasing its capital from $25,000 to $200,000. This change was approved by Harry C. Johnson, supervisor of banking institutions of the state of Washington on October 11, 1929. On that day the directors of the society passed a resolution offering to transfer all the assets of the society to the bank in consideration of the agreement

of the bank "to take over as savings accounts all deposit accounts of members of the Society and agree to pay interest thereon for the balance of the last half of 1929." Concurrently the same persons, acting as directors of the bank, passed a resolution accepting the offer of the directors of the society. Thereafter, beginning October 14, 1929, passbooks of the bank were issued to the respective members of the society for the same amount shown in their respective passbooks of the society. On November 4, 1929, a meeting of the members of the society was held at which meeting the action of the board of directors of the society taken on the 11th of October, 1929, was ratified. In November, 1929, the bank again amended its articles of incorporation to increase its capital stock from $200,000 to $1,000,000. On December 14, 1929, it was resolved by a meeting of the members of the society that the society be dissolved. The directors were also authorized by this meeting of the members to liquidate the affairs of the society and distribute its assets in accordance with the applicable statute of Washington (section 3742, Rem. Comp. Stat.). This action was approved on December 17, 1929, by the state director of efficiency and by W. L. Nicely, supervisor of the division of savings and loan of the state of Washington. Thereafter, on December 20, 1929, the directors of the bank adopted a resolution offering to purchase the assets of the society for $14,309,753.41. It was proposed that the purchase price should be immediately deposited in the bank and apportioned to each member in the society in an amount equal to a balance shown on the books of the society to be due him as of December 14, 1929, plus interest and less withdrawals. On the same day the directors of the society accepted the offer of the bank. Thereupon the bank issued checks to the society for the purchase price and the society issued checks for the same amount payable to the bank. These latter checks were deposited in the bank to the credit of the members of the society respectively. By this process it was sought to distribute its assets to the members of the society which by reason of the sale to the bank consisted of a credit in the bank for the amount fixed as the value of its assets.

Eliminating for a moment the consideration of the question of the reserve and surplus of the society, the effect of the transaction so far as the members of the society were concerned was that each had substituted for the right of a member of a savings and loan society to its property the right of a depositor in the savings bank to receive exactly the same amount. This obligation of the bank to the depositor was secured by the same assets, that had established the value of the members' right in the society with some minor exceptions due to readjustments which will be mentioned hereafter. The bank on October 11, 1929, began and thereafter continued to do business as a savings bank and also as a commercial bank, until the 15th day of June, 1932, when the supervisor of banking of the state of Washington took charge of the assets of the bank for the purpose of liquidating its affairs. At the final meeting of December 14, 1929, at which the members of the society authorized the transfer of all its assets to the bank and the dissolution of the society, it is alleged that 54,006 shares of the stock of the society were voted in favor of the resolution and 342 shares were voted against it; that of the 54,006 shares voting in favor of the resolution of ratification and of dissolution, J. L. Cooper voted 50,141 shares ("these votes represented what was claimed to be the interest of shareholders in the Society for whose pass books new pass books of the Spokane Savings Bank had been substituted"); that in addition Cooper voted 2,014 shares as proxy for shareholders who had not exchanged passbooks. It thus inferentially appears from the allegations of the complaint that in the interval from October 11, 1929, to December 14, 1929, the members of the society owning some 50,141 shares in the society had exchanged the passbooks of the society for the passbooks of the bank. There were 52,000 members and shareholders of the society on June 29, 1929, 30,000 of whom were school children who held capital investment in the society of $15,106,986.52. The assets of the society on that date consisted of $744,352.77 cash; first mortgage loans aggregating $15,873,692.84, including incomplete loans amounting to $221,701.45; United States bonds $69,712.50; loans on bonds $607,563.17; real estate sold on contract $128,669.94, and other real estate amounting to $24,354.39; a modern office building valued at $437,054.83; its total resources were $16,038,669.49. From the amount of cash on hand ($744,352.77), $347,332.72 cash was distributed as dividend on July 1, 1929. On July 1st, after paying all losses, the society had a contingent fund of $320,000, and an undivided profit of $42,648.80. This contingent fund of $320,000 of the society was used by the directors of the society and of the bank to make up a part of the $1,000,000 capital and a $100,000 surplus of the bank by transfers through the Spokane Midland Company, the Cooper Mortgage

Company, and the Franklin Investment Company, all controlled by the directors of the society in the following manner, to wit: The Spokane Midland Company was owned by the Spokane Savings Bank, although the title of all the stock of the Spokane Midland Company was held by an individual trustee for the bank; the Spokane Midland Company subscribed for $500,000 worth of the capital stock of the bank; the bank purchased the $320,000 contingent, or reserve, fund of the society at its book value, using $300,000 of the fund thus purchased to pay up the capital of the Midland Company which amount in turn paid up the subscription by the Midland Company to the stock of the bank; the Spokane Midland Company borrowed $200,-000 from a New York bank which it paid to the bank as the balance of its $500,000 stock subscription, and it hypothecated with a New York bank as security for the loan the stock of the bank amounting to $500,000 for which it had subscribed and paid for by the two amounts of $300,000 and $200,000, as aforesaid. It is alleged that "the transaction" (probably the New York bank loan, perhaps the entire $500,000 transaction, but which of these is not clear) was in legal effect a borrowing of money by the Spokane Savings Bank upon its own stock as collateral; that the $300,000 paid by the Spokane Midland Company to the bank was paid by "various bookkeeping entries and fictitious proceedings, the exact nature of which the plaintiffs do not know and have been unable to ascertain"; that the Midland Company owned no assets and the bank had no assets other than the property of the society, save a small amount of property which had been the property of the Security Trust Company, the exact amount of which is not known. Another $100,000 subscription of stock of the bank was made by the American Company, a subsidiary of the American Bank of Spokane, but was never actually paid.

It is alleged that Cooper and other officers and employees of the society were also officers of the bank, and subscribed for the increased capital stock of the bank, but either had not paid their subscriptions or if they were paid, had pledged the stock of the bank for the money which they had used to pay in and would be unable to respond to an assessment on their capital stock. The insolvency of the bank is alleged to have been brought about by the deposit of $375,000 belonging to the Spokane Savings Bank in the American Bank of Spokane which closed its doors April 15, 1932. Thereafter the bank declined to make payments of any funds to depositors save small amounts except on 60 days' notice and upon the expiration of 60 days, to wit, June 15, 1932, the bank was taken over by the supervisor of banking for the state of Washington.

The plaintiffs pray that the state supervisor of banking and his assistants be enjoined from disposing of the assets, business, and affairs of the society; that the court adjudge and decree that the transfer of the assets, business, and affairs of the society to the bank was illegal, void, and of no effect; that the action pretending to dissolve the society was illegal, void, and of no effect; that the assignment or deed of conveyance executed on behalf of the society to the bank on December 20, 1929, be canceled; that the assets be restored to the society, and that the bank and the state supervisor of banking be required to account in full to the society and its members and shareholders; that the society be authorized and directed to elect a board of directors under direction of court; that the court place its own trustee or representative in charge of the assets, business, and affairs of the society until such board should qualify; and that the court decree that the assets of the society have been and are now held in trust for the society and its shareholders, and for general relief.

We will now proceed to state some of the other facts alleged in the complaint which the appellees claim show that the plaintiffs were guilty of laches, notwithstanding their allegations that the facts alleged were unknown to them or to the other shareholders and members in the society, and that it was impossible for them to so inform themselves until after the bank was taken over by the liquidators June 15, 1932, and after the liquidators announced that the bank stock liability was unavailable to the creditors of the bank. The change of the name in which the contracts were made with the passbook holders from that of the Spokane Savings & Loan Society to that of the Spokane Savings Bank was in itself an indication of the character of the old and the new corporation, and of the nature of the transaction, for the powers and functions of the Savings & Loan Society and of the Savings Bank are matters of common knowledge and are defined by statute. This change was indicated also by the substitution of the signs, upon the place of business of the society of the name of the bank for the name of the society, and by the change of name on the passbooks and by the change of the passbooks themselves in which the contract was also changed from that of savings and loan membership to savings bank depositor. It is

alleged that at the time these changes were made from one set of passbooks to another the attention of the members of the society was called to the fact that they were exchanging passbooks in the society for passbooks in the bank; but that certain false representations concerning the nature and effect of the change were made to each member applying for a passbook at the time of the transfer from one set of passbooks to another; that at a meeting held December 14, 1920, at which 54,348 shares were represented the president represented that the purpose of the meeting was to convert the Spokane Savings & Loan Society into a capitalized savings bank; that the attorney for the society also made certain representations at the same time and place, among others, that the Spokane Savings Bank was a different corporation; that it was not a new corporation; that it had been known as the Security Trust Company; that the reason "we had that corporation was that there was a considerable demand on the part of our friends and customers to do a trust business"; that a savings and loan society could not do a trust business nor handle a fire insurance business, and that the corporation was put in to handle that business and had been operating for several years; that the directors had increased its capital and changed its corporate name so that it could be in the savings bank business and not in the commercial business and had increased its capital to a million dollars with a surplus of $100,000 and stated further:

"Now, technically, it is another corporation, but as a matter of fact in substance it is just the same thing. It has the same officers; it has the same directors; it has got to do business and is doing business in the same banking room; it has the same investments; it is going to continue to do business in precisely the same way it has; and while it has a little wider power so far as its business is concerned, it intends to do business just exactly like the Spokane Savings and Loan Society. * * *

"In the past two months and more since this change was announced, the Spokane Savings Bank has been opening accounts of its own, as well as those of our other customers who have come in and voluntarily changed their accounts to the Spokane Savings Bank."

It was also stated at that time and place that the $320,000 contingent fund was going to be taken over by the new corporation. While it is alleged that some of these statements were false, they sufficiently indicated the nature of the proposed change to require an investigation on the part of those who knew thereof and objected to the change. They were put upon notice as to the actual transaction between the new and the old corporation which was shown by the books of the two corporations.

The complaint not only charges that fraud was committed against the society, but also that the several members and shareholders of the society were induced by false representations to exchange their respective passbooks in the society for those in the bank. It is not clear from the complaint whether the plaintiffs have made an exchange of passbooks. The rights of those who exchange their passbooks to attack the exchange as invalid because of fraudulent representations made at the time of the transfer of their respective passbooks is several and not joint. Their causes of action could not be united even by an agreement to that effect. Associated Almond Growers v. Wymond (C. C. A.) 42 F. (2d) 1. Each has a right either to affirm the contract and sue for damages, if he has suffered any, or to rescind the contract for fraud, if he acts promptly, or he may waive the fraud. This right of election cannot be exercised by any one else upon his behalf. In each particular case the question of fraud would depend upon the representations made in the individual case and the question of laches in each case would depend upon the subsequent acquisition of knowledge of sufficient facts to put the particular party defrauded upon notice. See the Sacramento Suburban Fruit Lands Cases (C. C. A.) 36 F. (2d) 907–942, 946–953. It is clear that some of the members and stockholders who exchanged passbooks were fully advised of and participated in the transaction. Some of them, it is alleged, were the officers of the bank and of the society who conceived and executed the plan, others subscribed for stock in the bank, some paying therefor in borrowed money, some by exchanging their membership in the society for stock in the bank instead of for a passbook of the bank. These considerations indicate the confusion resulting from commingling in one action the rights of the society and the rights of the individual members. It is clear from what has been stated that many of the members would not be entitled to cancel their contracts of exchange even if they made the exchange relying upon misrepresentations of material facts. They voluntarily assumed the relation of depositors in the bank. We need not consider the results of this confusion other than to notice that the difficulties of undoing the transaction between the bank and the society increased with every day of delay, because of the new

relationships assumed by the members and shareholders of the society to each other and to the public in the new commercial and savings bank business.

In considering the question of laches it should also be noted that the Supreme Court of Washington has decided with reference to this very transaction between the society and the bank that the members and shareholders of the society "who objected to and voted against the resolution for dissolution of the Savings and Loan Society, and all persons who were minors, were entitled to have their respective accounts credited or paid by the Spokane Savings Bank to the amount of their respective proportionate shares in what is called the contingent or reserve fund in addition to the amount of their deposits plus interest." This conclusion was based upon section 3731, Rem. Comp. Stat., Wash., which, the court said, "in part provides for the enforcing of withdrawal of shares, and provides that the holders thereof shall be paid the full value of the shares, including, in such case, their proportionate value of the contingent fund." The effect of this decision of the Supreme Court of Washington is that non-consenting members of the society could and did follow the assets of the society into the hands of the bank, which was treated as a trustee for their proportion of the assets which had been transferred to it by the society. This decision was predicated in part upon the finding and conclusion that the society had been legally dissolved. In the case at bar we cannot treat the society as legally dissolved because of the allegation that the newspaper in which the notice of the meeting for dissolution was published, the Spokane Weekly Chronicle, is not a newspaper of general circulation, although the Supreme Court of Washington held it to be a newspaper of general circulation upon the facts proved in that case. In view of the decision of the Supreme Court of Washington as to the rights of nonconsenting members of the society in case of dissolution and transfer of assets, it is apparent that what the plaintiffs are insisting upon is that the society continue to function as such retaining the assets it originally held, either for the continuance of the business of the society or for the members, to be administered as a unit in their behalf. In short that they be considered joint owners of the property of the society now in the hands of the receivers of the bank, instead of being considered creditors of the bank. The insolvency of the bank and the possession of its assets by the state officers charged with the duty of liquidation, if not an insuperable objection

to the proposed plan, is a decisive factor in the application of the doctrine of laches. The members of the society having permitted the bank to use the assets of the society in the business of a savings and commercial bank for over two years and until the bank has become insolvent and its assets taken over by the officers of the state must be held for that reason, if for no other, to have waited too long to enforce their right to complain of the transfer. Their right to do so is barred by laches. Wright et al. v. Tacoma Gas & Elec. Lt. Co., 53 Wash. 262, 101 P. 865, and cases cited therein.

A petition for leave to intervene was filed in the lower court by Carroll Smith and others who allege that after the 11th of October, 1929, and prior to the 15th day of June, 1932, they had become depositors in the Spokane Savings Bank, and that all of them are now regarded and considered as creditors of the Spokane Savings Bank. They sought to intervene on behalf of themselves and of all other depositors in the Spokane Savings Bank similarly situated. It is not clear from the allegations of the petition in intervention how the interveners became depositors, whether by depositing money after the transfer of the assets of the society above mentioned, or whether they became creditors by virtue of the terms of the exchange. The trial court denied the motion for leave to intervene but granted leave to the petitioners to join in the complaint as parties plaintiff. They appeal from this order. This order is not appealable and the motion to dismiss the appeal should be granted. Equity Rule 37 (28 USCA § 723) ; City of New York v. New York Tel. Co., 261 U. S. 312, 43 S. Ct. 372, 67 L. Ed. 673; Credits Commutation Co. v. U. S., 177 U. S. 311, 20 S. Ct. 636, 44 L. Ed. 782.

We will now consider the points separately raised by the society in its brief. It filed an answer in the lower court alleging that since the commencement of the suit the members had elected a new board of directors and that it is qualified to control its affairs. It prayed for substantially the relief asked by the plaintiffs and also that all depositors in the bank after the transfer of the assets of the society to the bank be declared shareholders in the society. It is claimed that the doctrine of laches is not applicable to the transactions between the society and the bank for the reason that the transactions complained of were ultra vires, because the "acts of the directors in attempting to convert all the assets of the Society to the Bank were unauthorized, void and of no effect." This contention is predicated upon

the proposition that as the assets of a profitable and going corporation cannot be transferred without the consent of all the stockholders of the corporation, a mere lapse of time would not validate such unlawful and unauthorized acts. This view is erroneous. Laches is a defense to the action of a minority stockholder or shareholder to set aside corporate acts whether fraudulent or ultra vires. Winter v. Southern Securities Co., 155 Ga. 590, 118 S. E. 214; Wright v. Tacoma Gas & Elec. Lt. Co., 53 Wash. 262, 101 P. 865, supra; Rabe v. Dunlap, 51 N. J. Eq. 40, 25 A. 959; Marks v. Merrill Paper Co. (C. C. A.) 203 F. 16; Berkeley County Court v. Martinsburg & Potomac Turnpike Co., 92 W. Va. 246, 115 S. E. 448; Cullen v. Coal Creek Co. (Tenn. Ch. App.) 42 S. W. 693.

The appellees claim that the case of Beutelspacher v. Spokane Sav. Bank, 164 Wash. 227, 2 P.(2d) 729, supra, is res judicata herein, but that defense not being shown on the face of the plaintiffs' complaint cannot be considered. The defense of res judicata must be alleged.

The appeal of the petitioners Smith and others, who sought leave to intervene, is dismissed.

The decree is affirmed.